**Paul Steven BRUTON, Petitioner,**

v.

**Thomas PHILLIPS, Respondent.**

No. Civ. 97–40523.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 10, 1999.

Paul S. Bruton, Jackson, MI, petitioner pro se.

Laura G. Moody, Michigan Department of Attorney General, Habeas Corpus Division, Lansing, MI, for Thomas Phillips, respondent.

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

GADOLA, District Judge.

Petitioner, Paul Steven Bruton ("petitioner"), presently confined at the Charles Egeler State Prison in Jackson, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his application, filed pro se, petitioner challenges his conviction and sentence on two counts of first degree murder, M.C.L. 750.316; M.S.A. 28.548. For the reasons stated below, petitioner's application for writ of habeas corpus is denied.

### I. Background

On October 20, 1985, the bodies of Dr. Alan Kahn and Valentina Hurst were discovered by the Sterling Heights police and Ms. Hurst's son in the home they shared in Sterling Heights, Michigan. Kahn had died as a result of strangulation by ligature and Hurst had died from a single shotgun wound to the right cheek.[1]

A Macomb County grand jury indicted petitioner and co-defendant Perry Davis for the murders and also charged Leslie Miller with being an accessory after the fact. A preliminary examination was conducted in the Sterling Heights District Court on August 20, 1986. Petitioner and the co-defendants were bound over to the Macomb County Circuit Court for trial.[2]

On October 29, 1986, petitioner was arraigned before the chief judge of the Macomb County Circuit Court, who assigned this case to Judge Robert Chrzanowski. On November 7, 1986, the case was reassigned to Judge Raymond Cashen. The case was then re-assigned to Judge John B. Bruff, because the co-defendants in this matter had already been assigned to this judge. Nothing in the record shows that petitioner objected to the transfer of his case to Judge Bruff.

Petitioner filed a motion to quash the information, claiming that the introduction at his preliminary examination of out-of-court statements made by the co-defendant which implicated petitioner were hearsay and violated petitioner's right to confrontation. He also brought a motion for a separate trial. Judge Bruff adjourned trial in this matter and referred the motions to the chief judge, who in turn, assigned Judge Cashen to hear these motions. On April 16, 1987, Judge Raymond Cashen ruled that admission of a co-defendant's extrajudicial statements was a violation of petitioner's right to confrontation and quashed the information, remanding the matter back to district court for further proceedings.[3] At that time, the trial court reserved its ruling on the issue of granting a separate trial to petitioner.

On June 25, 1987, a second preliminary examination was conducted. At the second preliminary examination, the prosecu-

---

1. Testimony of Dr. Werner Spitz, Trial Transcript of November 20, 1987, pp. 614, 620–624.

2. A person indicted by a grand jury in Michigan still has a right to have a preliminary examination. *People v. Duncan,* 388 Mich. 489, 201 N.W.2d 629 (1972).

3. Opinion of the Court on Motion to Quash, dated April 16, 1987.

tion presented a witness, John Butsinas, who testified that petitioner had admitted his participation in these homicides while the two men were in a holding cell in the Macomb County Circuit Court. Petitioner was again bound over to circuit court to stand trial on these charges.

On August 5, 1987, petitioner was arraigned in front of Chief Judge George Deneweth, who again assigned this case to Judge John B. Bruff.

On September 21, 1987, Judge Raymond Cashen granted petitioner's earlier filed motion for a separate trial.[4] On October 29, 1987, the prosecutor filed a request to be allowed to introduce into evidence extrajudicial statements made by co-defendant Davis to civilian witnesses that inculpated petitioner in this offense. Judge Bruff ultimately ruled, over petitioner's counsel's objections, that these statements were admissible under the hearsay exception as statements against penal interest. In so ruling, the trial court indicated that it did not consider this to be a reversal of Judge Cashen's earlier rulings, noting that Judge Cashen had not considered the issues in the same way that he did. The trial court, in noting that Judge Cashen had earlier excluded this testimony under *Bruton v. United States, infra,* held that for *Bruton* to apply, all of the co-defendant's statements would have to be excluded as not being statements against penal interest.[5]

Several witnesses testified at trial concerning incriminating statements made by co-defendant Davis. Some of these statements also implicated petitioner[6]. The first witness, Lawrence Gadomski, testified that he had first met co-defendant Davis in Jackson state prison in 1984 prior to this incident. Gadomski testified that Davis initially told him that Hurst was his girlfriend, that he had been working for Dr. Kahn and Hurst and that he planned on going back to work for them upon his release from prison. Several months later, Davis became upset at Hurst, claiming that she owed him money. Davis started talking about killing "them" upon his release from prison. Davis said he would "blow her face off" and also stated that he would take jewelry that belonged to Hurst as payment for the money owed to him. Gadomski said Davis repeatedly discussed killing Hurst.

Gadomski testified that he met petitioner in prison in 1984 at the same time that these discussions were taking place with Davis. Gadomski and petitioner discussed Davis' plans to rob and kill Hurst on several occasions. According to Gadomski, petitioner at one point stated that he was thinking of going in on this plan with Davis. Petitioner had heard that there were rings, jewelry, and money (to be gained) and that the plan sounded lucrative to him. Gadomski, however, never heard petitioner mention any grudges against either victim or any discussions to kill them.

Sally Simmons–Murray testified that Davis told her he loved Hurst and disliked Kahn. She related that Davis had been fired from his job with Hurst and Kahn and was angry because they owed him money. She also indicated that in October of 1985, she observed Davis sawing the barrel and stock of a shotgun in her home.

Susan Coward testified that on October 19, 1985, petitioner and co-defendant Davis arrived at co-defendant Leslie Miller's house between 7:00 and 8:15 p.m. Davis informed her that she would not have to worry about Valentina (Hurst) chasing her fiancee Walter Kitsonis, a/k/a Saul anymore. Davis told Coward to watch the news on television that evening. While leaving Miller's house, petitioner told her

**4.** Circuit Court Disposition, September 21, 1987.

**5.** Transcript I, pp. 147–150.

**6.** Petitioner's counsel objected both before and during trial to the admission of each of these witness' testimony on the grounds that the evidence was hearsay and violated petitioner's Sixth Amendment right to confrontation.

that: "Perry fucked up. He really fucked up. We have to go back and clean it up." Petitioner also told Coward he was angry that Davis had told anyone about the murder and his involvement.

Coward indicated that petitioner and Davis returned to Miller's residence around midnight, but petitioner only stayed fifteen minutes. After petitioner left, Davis again asked her if she had watched the news. He then told her that something "tragic" had happened to Valentina and suggested that the two play a hand of cards, because the police would be questioning them later and they should therefore establish an alibi. Davis also told Coward to tell petitioner to get away from the house if he returned because the police would be following him.

The following morning, Coward heard the news of the murders over the radio. When she confronted Davis, Davis admitted that petitioner had shot Hurst in the face and he had strangled and slit Kahn's throat.

Coward admitted on cross-examination that she had altered earlier statements that she had made to the police, after being threatened with prosecution for perjury. Coward also received one thousand ($1,000.00) dollars from law enforcement authorities to relocate to another state after the trial ended.

Marcia McLean Davis testified that petitioner and Davis left her Oak Park home on October 19, 1985 around 6:30 p.m. Davis was carrying a plastic bag which she believed contained a short barreled shotgun. At around 3:00 a.m. Davis returned to her residence and told her that he had killed Alan (Kahn) by choking him and that petitioner had shot Hurst in the face. Davis showed McLean–Davis a wallet with Kahn's driver's license and American Express card. He also showed her a check for three hundred ($ 300.00) dollars which he claimed he obtained from Hurst.

McLean–Davis had previously been held in contempt of court for committing perjury in front of the grand jury. She admitted that she changed her story after being threatened with prosecution for perjury. McLean–Davis acknowledged lying in front of the grand jury her first time in front of it and also admitted receiving immunity from prosecution for perjury in exchange for her agreement to testify again in front of the grand jury. She also admitted receiving three hundred and fifty ($ 350.00) dollars to relocate once the trial had concluded.

Other witnesses testified as to admissions made by petitioner concerning his involvement in this offense. John Butsinas was detained with petitioner inside of a holding cell at the Macomb County Circuit Court in December of 1986. Petitioner admitted his involvement in this offense, but bragged that he was going to beat the charges. Butsinas said that petitioner informed him that Hurst had been killed because she was blackmailing other doctors for (illegal) prescriptions and informing on those doctors who wouldn't cooperate with her to the Drug Enforcement Agency. Petitioner told Butsinas that he shot Hurst in the face with a shotgun. He also indicated that the co-defendant had killed Dr. Kahn.

Butsinas testified that he was currently serving a seven (7) to thirty (30) year sentence for breaking and entering and being a third habitual offender. Butsinas admitted to a long criminal record, mainly for breaking and entering charges and also acknowledged that he had cooperated with and testified on behalf of both state and federal authorities on several occasions in exchange for sentencing considerations. The witness insisted, however, that the only consideration being given for this testimony by the authorities was that he would be transferred to a federal prison to protect him from retaliation for his testimony.

John Marantic testified that in August of 1986 he was brought back from state prison, where he was already serving a sentence, to stand trial on an extortion charge in Macomb County. Marantic shared the same jail cell with co-defendant Davis, who

purportedly discussed the murders of Hurst and Kahn with him. Marantic contacted a lawyer to represent co-defendant Leslie Miller. Subsequent to this discussion with Davis, Marantic gave a statement to law enforcement authorities concerning Davis' admissions.

Marantic was subsequently returned to state prison. Several months later, he was returned to Macomb County to stand trial on unrelated drug and fraud charges. While Marantic was on the seventh floor of the Macomb County Jail, petitioner came and knocked on his door and asked him who he was. When Marantic identified himself, petitioner warned him about testifying against Davis. Petitioner also had in his possession a copy of Marantic's statement which he proceeded to read "real loud" so that all of the inmates on the floor could hear it. According to Marantic, he had observed co-defendant Davis, who was also incarcerated on the same floor, pass the statement through the cell door to petitioner. Petitioner purportedly showed Marantic's statement to other inmates on the floor. Petitioner also informed Marantic that he would not be used as a witness by the state at trial because his statement concerning how the murders had taken place was wrong. Petitioner told Marantic that: "we fucked up", that he and Davis had killed both victims and that they had to go back to clean the scene up.

On December 18, 1987, petitioner was found guilty of two counts of first degree murder and was subsequently sentenced to life imprisonment without parole.

Petitioner appealed to the Michigan Court of Appeals. That court affirmed the judgment of conviction on November 15, 1990.[7] The Michigan Supreme Court denied leave to appeal on December 17, 1991, with Chief Judge Cavanagh dissenting.[8] A petition for writ of certiorari to the United States Supreme Court was denied on October 5, 1992.[9]

Petitioner subsequently filed a motion for relief from judgment which was denied by the Macomb County Circuit Court on August 1, 1994. The Michigan Court of Appeals denied leave to appeal from the denial of this motion on February 14, 1995.[10] The Michigan Supreme Court denied leave to appeal on October 31, 1995.[11]

Petitioner now seeks a writ of habeas corpus on the following grounds:

I. WAS PETITIONER'S SIXTH AMENDMENT RIGHT TO CONFRONTATION VIOLATED BY THE ADMISSION OF OUT–OF–COURT STATEMENTS OF A NON–TESTIFYING CO–DEFENDANT WHICH INCRIMINATED PETITIONER IN THE ABOVE OFFENSE?

II. WAS PETITIONER'S APPELLATE COUNSEL INEFFECTIVE, WHEN HE FAILED TO RAISE ON APPEAL THE ISSUE OF JUDGE JOHN B. BRUFF REVERSING THE RULING OF ANOTHER CIRCUIT COURT JUDGE SUPPRESSING THE OUT–OF–COURT STATEMENTS OF THE CO–DEFENDANT FROM COMING INTO EVIDENCE AT PETITIONER'S TRIAL?

III. DID THE PROSECUTOR'S COMMENTS IN HIS CLOSING ARGUMENT AMOUNT TO AN IMPERMISSIBLE REFERENCE TO PETITIONER'S DECISION NOT TO TESTIFY, IN VIOLATION OF HIS FIFTH AMENDMENT PRIVILEGE AGAINST SELF–INCRIMINATION?

Respondent, in his Answer to the Petition for Writ of Habeas Corpus raises the following counterissue:

I. WAS RESPONDENT PREJUDICED IN HIS ABILITY TO RE-

---

**7.** Michigan Court of Appeals Docket # 107359.

**8.** Michigan Supreme Court Docket # 90532.

**9.** United States Supreme Court Docket # 91–8393.

**10.** Michigan Court of Appeals Docket # 180752.

**11.** Michigan Supreme Court Docket # 102524.

SPOND TO THIS PETITION AND SHOULD THE PETITION BE DISMISSED PURSUANT TO RULE 9(a) DUE TO PETITIONER'S DELAY IN FILING THIS PETITION WITH THE COURT?

## II. *Standard of Review*

Review of a state court's decision under 28 U.S.C. § 2254 is governed by the standards established by the Antiterrorism and Effective Death Penalty Act, Pub.L. No. 104–132, 110 Stat. 1214 (Apr. 26, 1996). The Act altered the standard of review that a federal court must use for writs of habeas corpus. As amended, 28 U.S.C. § 2254(d) provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in ·the State court proceeding.

28 U.S.C. § 2254(d).

■ The first question that a federal court must ask is whether the state court's resolution of any legal questions underlying its decision on the claim was contrary to clearly established federal law. *Drinkard v. Johnson*, 97 F.3d 751 (5th Cir. 1996); *cert den.* 520 U.S. 1107, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997). The "unreasonable application" standard of review must mean more than that a federal court may grant habeas relief based upon its simple disagreement with the state court's decision. The use of the word 'unreasonable' in this restrictive standard of review implies that federal courts must· "respect all reasonable decisions of state courts." *Drinkard, supra* at 768.

■ A federal court must apply the presumption of correctness to state court findings of fact for habeas corpus purposes unless convincing evidence is offered to rebut this presumption. *West v. Seabold*, 73 F.3d 81, 83 (6th Cir.1996); *cert. den.* 518 U.S. 1027, 116 S.Ct. 2569, 135 L.Ed.2d 1086 (1996). 28 U.S.C. 2254(e)(1).

To implement this new standard of review, the United States Court of Appeals for the Sixth Circuit chose to follow an approach employed by the United States Court of Appeals for the First Circuit in *Martin v. Bissonette*, No. 96–1856, 1997 WL 280602, *9 (1st Cir. May 29, 1997), withdrawn and new opinion issued, 118 F.3d 871 (1997). *Harpster v. Ohio*, 128 F.3d 322, 326–27 (6th Cir.1997).[12] First, the reviewing court should determine whether the Supreme Court has established a precedent which clearly compels an outcome for the issue at hand. Then, if no such Supreme Court precedent exists, the court should determine whether the state court decision involved an unreasonable application of federal law as established by the Supreme Court. *Harpster*, 128 F.3d at 327.[13]

---

**12.** It should be noted that the First Circuit withdrew its initial opinion because the Supreme Court subsequently held that the AEDPA was not to be applied retroactively. *Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 2067–68, 138 L.Ed.2d 481 (1997). The petition in *Martin* had been filed prior to the effective date of the AEDPA and therefore was not subject to its provisions. Despite the fact that the First Circuit withdrew its analysis of the applicable standard of review under the

AEDPA, the Sixth Circuit has elected to follow the reasoning of that withdrawn decision.

**13.** The court compared this approach to that of the Courts of Appeals for the Fifth and Seventh Circuits as outlined in *Drinkard v. Johnson*, 97 F.3d 751, 767–68 (5th Cir.1996) and *Lindh v. Murphy*, 96 F.3d 856, 870 (7th Cir.1996), *rev'd on other grounds*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Under that approach, the reviewing court first

■ Under the standard outlined in *Harpster*, the initial question is whether a Supreme Court precedent determines the outcome for the issues raised in the petition for writ of habeas corpus. If there is no Supreme Court precedent controlling those issues, then this Court must determine whether the state court decision on those issues constituted an unreasonable application of federal law as established by the Supreme Court.

## III. *Discussion*

**A. Claim # 1.** Petitioner first claims that his right to confrontation under the Sixth Amendment was violated by admission of extrajudicial statements made by the co-defendant to various civilian witnesses. The trial court allowed Davis' admissions into evidence, ruling that they were statements against penal interest. On appeal, the Michigan Court of Appeals agreed:

> We have examined the record and we believe that the statements at issue fell squarely within the statement against penal interest exception to the hearsay rule, MRE 804(b)(3). We are satisfied that Davis was "unavailable" within the meaning of the court rule, and that his statements were truly against his penal interests. Further, the content of the statements and the circumstances under which the statements were made provided sufficient indicia of reliability so as to survive defendant's confrontation clause challenge. Therefore, the trial court did not abuse its discretion by admitting the testimony at issue. We note that, contrary to *Watkins*, this case does not present a *Bruton* issue, because this was not a joint trial, the statements at issue were made prior to arrest, and the statements were not made to the police. (citations omitted).[14]

■ The Sixth Amendment confrontation clause is applicable to the states under the Fourteenth Amendment due process clause. A primary interest secured by the confrontation clause is the right to cross-examination. *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965).

In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court ruled that the introduction of a nontestifying co-defendant's confession to police at a joint trial violated the defendant's right to confrontation, even though the trial court instructed the jury not to consider the co-defendant's confession as evidence against defendant Bruton in their deliberations as to his guilt or innocence. The Supreme Court noted that under traditional rules of evidence, the admission of a co-defendant's confession inculpating the defendant would be inadmissible against the accused as hearsay. *Bruton v. United States, supra* at 128, fn. 3, 88 S.Ct. 1620 fn. 3. The Supreme Court noted that incriminations made by an accomplice are suspect given the recognized motivation to shift blame. *Bruton v. United States, supra* at 135, 88 S.Ct. 1620.

Courts have also found a defendant's right of confrontation violated where a co-defendant's confession inculpating the accused is introduced against him in a separate trial. *Goodwin v. Page*, 418 F.2d 867 (10th Cir.1969).

■ The Sixth Amendment protections are not so broad, however, as to exclude the admission of certain hearsay statements against an accused despite his inability to confront the declarant at trial. Certain types of hearsay are admissible if the declarant is unavailable and the statement bears adequate indicia of reliability.

determines whether the issue at hand is one of law, fact, or a mixed question of law and fact. If the issue is one of fact, § 2254(d)(2) applies. If one of law, the "contrary to" language of § 2254(d)(1) applies, and if one of mixed law and fact, the "unreasonable application" language of § 2254(d)(1) applies. Although the Court of Appeals for the Sixth Circuit chose to adopt the First Circuit approach, the court noted that the two approaches would likely lead to the same result. *Harpster*, 128 F.3d at 327.

**14.** Michigan Court of Appeals Docket # 107359, November 15, 1990.

*Latine v. Mann*, 25 F.3d 1162 (2nd Cir. 1994); *cert. den.* 514 U.S. 1006, 115 S.Ct. 1319, 131 L.Ed.2d 200 (1995). As the Supreme Court recently noted in *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999), the criteria employed to make such a determination is that:

> the veracity of hearsay statements is sufficiently dependable to allow the untested admission of such statements against an accused when (1) "the evidence falls within a firmly rooted hearsay exception" or (2) it contains "particularized guarantees of trustworthiness" such that adversarial testing would be expected to add little, if anything, to the statements' reliability.

*Id.* at 1894 (quoting *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)); *see also Curro v. U.S.*, 4 F.3d 436 (6th Cir.1993).

 If the evidence sought to be admitted does not come within a firmly rooted exception to the hearsay rule, then the hearsay evidence used to convict a defendant must possess an indicia of reliability by virtue of its inherent trustworthiness, not by reference to corroborating evidence at trial. *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). For purposes of determining whether a hearsay statement bears particularized guarantees of trustworthiness that would allow its admission at trial, the particularized guarantees of trustworthiness must be shown from the totality of the circumstances, but the relevant circumstances include only those surrounding the making of the statement and that render the declarant particularly worthy of belief. The circumstantial guarantees of trustworthiness are those that exist at the time the statement was made and do not include those that may be added by using hindsight. *Idaho v. Wright, supra.*

 An out of court statement is presumptively reliable, however, if it falls within a firmly rooted exception to the hearsay rule. *State of Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Evidence admitted under such a firmly rooted exception to the hearsay rule is presumed to be so trustworthy that adversarial testing would add little to its reliability. *Idaho v. Wright, supra* at 821, 110 S.Ct. 3139.

In this case, respondent argues that these statements were admissible as statements against penal interest. Respondent further contends that the hearsay exception codified by Fed.R.Evid. 804(b)(3), which includes statements against penal interest, is a firmly rooted exception to the hearsay rule. Accordingly, respondent argues that the admission of these statements did not result in a violation of petitioner's right of confrontation.

At the outset, this court notes that it is not at all clear that the statements against penal interests exception is a "firmly rooted exception" to the hearsay rule, as applied in circumstances similar to the instant case. It is true that a number of circuits, including the Sixth Circuit, have held that the statements against interest exception codified by Rule 804(b)(3) is a firmly rooted exception. *See Neuman v. Rivers*, 125 F.3d 315, 319 (6th Cir.), *cert. denied*, 522 U.S. 1030, 118 S.Ct. 631, 139 L.Ed.2d 610 (1997); *United States v. York*, 933 F.2d 1343, 1362–64 (7th Cir.1991); *United States v. Seeley*, 892 F.2d 1, 2 (1st Cir.1989); *United States v. Katsougrakis*, 715 F.2d 769, 776 (2d Cir.1983). However, the plurality opinion in *Lilly*, which was decided June 10, 1999, explicitly noted:

> [t]he decisive fact ... is that accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence.

*Lilly*, 527 U.S. at ——, 119 S.Ct. at 1899.

Fortunately, there is no need to resolve this issue in this case because the statements are admissible under the second prong of the test set forth in *Roberts* and reiterated in *Lilly*; that is, the statements bear "particularized guarantees of trustworthiness" that render them admissible

under the totality of circumstances. *See Latine*, 25 F.3d at 1166; *United States v. Garcia*, 897 F.2d 1413, 1421 (7th Cir.1990).

 At the outset, it is clear that the portions of the statements in which Davis confesses to one of the murders constitute statements against penal interest. Such a confession clearly constitutes a statement which at the time of its making so far tended to subject the declarant to criminal liability "that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Fed.R.Evid. 804(b)(3). The question before the court is whether the inculpatory portions of those statements bear similar indicia of reliability.

 Under the circumstances of this case, and upon a thorough review of the relevant authority, this court finds that the inculpatory portions of Davis' statements do, in fact, contain particularized guarantees of trustworthiness sufficient to render the complete statements admissible. First, and perhaps most importantly, the statements were made to friends and personal acquaintances, not to law enforcement officers. The Second Circuit's opinion in *Latine* is instructive on this point. The court noted that:

[a]s a general matter, if a declarant's statement results from a formal police interrogation, it cannot be introduced against a defendant as evidence of his guilt unless other evidence demonstrates that the defendant adopted or authorized the statement. *Lee v. Illinois*, 476 U.S. 530, 541–42, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986). The admission of such a statement may not violate the Confrontation Clause, however, if the declarant makes the statement to someone who he believes is an ally, and "if the circumstances surrounding the por-

tion of the statement that inculpates the defendant provide no reason to suspect that the inculpatory portion is any less trustworthy than the part of the statement that directly incriminates the declarant." *United States v. Matthews*, 20 F.3d 538, 546 (2d Cir.1994).

*Latine*, 25 F.3d at 1166–67. In *Latine*, as in this case, the statement at issue was not made to a law enforcement officer in the context of an interrogation. The court explicitly found that because the declarant "made the statement to a perceived ally, not to law enforcement officials, ... it cannot be said that he made the statement in an effort to curry favor or in a coercive atmosphere." *Id.* at 1167 (citing *Katsougrakis*, 715 F.2d at 776).

In *York*, the Seventh Circuit, when faced with similar circumstances, held that:

[t]he circumstances surrounding [the declarant's] statements inculpating [the defendant]—speaking to acquaintances unconnected to law enforcement—made them eminently trustworthy; so trustworthy, in fact, that the advisory committee used that scenario as an example of an inculpatory statement that "would have no difficulty qualifying" for admission under 804(b)(3).

*York*, 933 F.2d at 1362–63.[15]

Finally, Chief Justice Rehnquist's concurring opinion in *Lilly* specifically notes that confessions to family members or friends bear "sufficient indicia of reliability to be placed before a jury without confrontation of the declarant." *Lilly*, 527 U.S. at ——, 119 S.Ct. at 1905 (Rehnquist, J., concurring) (citing *Dutton v. Evans*, 400 U.S. 74, 89, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970)). The concurring opinion goes on to note that several federal courts have

---

**15.** The advisory committee notes to Fed. R.Evid. 804(b)(3) provide, in pertinent part: [w]hether a statement is in fact against interest must be determined from the circumstances of each case. Thus a statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with

the authorities and hence fail to qualify as against interest.'... On the other hand, the same words spoken under different circumstances, e.g., to an acquaintance, would have no difficulty in qualifying.

*See also United States v. Costa*, 31 F.3d 1073, 1078 (11th Cir.1994).

reached the same conclusion. *Id.* (citing *York, Seeley,* and *Katsougrakis* ).

Accordingly, the fact that Davis' statements were spontaneous, voluntary statements made to acquaintances, rather than statements made to law enforcement officers in an attempt to curry favor or in a coercive atmosphere, provides substantial support for the conclusion that the statements are reliable.

Second, Davis makes no attempt to diminish his own role in the murders, or to shift blame to petitioner, in the context of the statements admitted at trial. Davis admitted to both Coward and McLean–Davis that he killed one of the victims by choking him. Davis did not indicate that petitioner forced him to do it, or that petitioner was the ringleader of the nefarious activities. The inculpatory portion of the statements, related to the other murder, do not appear, from a review of the statements themselves, to be an attempt by Davis to diminish his role in the murders. He merely states that he killed one of the victims, and petitioner killed the other. As the court held in *York:*

> when … the inculpatory portion of a statement is also against the declarant's interest, or when it is neutral because the declarant has not attempted to diminish his own role, there is little reason to suspect that portion of an otherwise reliable statement is untrustworthy.

*York,* 933 F.2d at 1363 (citing *Lee,* 476 U.S. at 551–52, 106 S.Ct. 2056). Accordingly, the fact that Davis did not attempt to shift blame or diminish his role in the events lends further support to the conclusion that the statements attributed to Davis that were admitted at petitioner's trial were reliable.

Ultimately, after a thorough review, this court finds that Davis' statements "bear adequate indicia of reliability" (*see Roberts,* 448 U.S. at 66, 100 S.Ct. 2531), to justify their admission. These statements were not made to police while in custody under potentially coercive conditions or done with the motivation of currying favor or shifting blame from the declarant to

petitioner. Most of Davis's statements were made to his friends and acquaintances shortly after the murders of the victims and prior to arrest. Davis did not attempt to shift blame from himself to petitioner but clearly acknowledged his active role in this crime to the witnesses. Accordingly, this court finds that the trial court's decision to admit these statements into evidence did not result in a violation of petitioner's Sixth Amendment right of confrontation.

This court does note, however, that it has serious misgivings with respect to the distinction between inculpatory hearsay statements made to acquaintances and those made to law enforcement officers. Often there are incentives to misrepresent the truth in conversation with acquaintances, family and friends that are as powerful as the incentives to misrepresent the truth in conversations with authorities. Likewise, there are powerful incentives to tell the truth to authorities that do not necessarily operate in conversations with relatives or friends. Accordingly, there appear to be strong reasons to require that defendants be protected from the introduction of inculpatory hearsay statements made during the confessions of co-defendants, regardless of the identity of the person to whom the co-defendant confesses. That said, this court nonetheless finds that, pursuant to the relevant case authority and under the particular circumstances of this case, Davis' statements were admissible as statements against interest and not violative of petitioner's Sixth Amendment right of confrontation.

Additionally, this court notes that the testimony of Larry Gadomski and Sally Simmons–Murray did not violate petitioner's Sixth Amendment right to confrontation because the statements made by co-defendant Perry Davis to them did not incriminate petitioner or even mention him at all. An extrajudicial statement must clearly implicate a defendant in order for there to be a violation of the Sixth Amendment right to confrontation. *Richardson*

v. *Marsh*, 481 U.S. 200, 208, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). Because the statements made by Davis to Gadomski and Murray did not even mention petitioner, their admission into evidence did not violate the Sixth Amendment right to confrontation.

Therefore, for the reasons set forth above, this Court concludes that the Michigan courts' determination that Davis' statements were admissible as statements against penal interest was not contrary to, or an unreasonable application of, federal law. Petitioner's first claim must therefore fail.

**B. Claim # 2.** Petitioner next claims that his appellate attorney was ineffective because he failed to raise on appeal the issue that Judge John Bruff reversed the earlier rulings of Judge Cashen and allowed the extrajudicial statements of co-defendant Davis into evidence at trial. While conceding that his appellate counsel did raise the issue on appeal as it pertained to the violation of his Sixth Amendment right to confrontation, petitioner argues that the result would have been different on appeal had petitioner's appellate counsel also argued that Judge Bruff's reversal of the ruling by Judge Cashen excluding the evidence was improper under Michigan court rules. Petitioner's argument is without merit.

Petitioner raised this issue post-appeal in his motion for relief from judgment. Petitioner claimed that MCR 2.613(B) mandates that a judgment or order by a state trial court judge may only be set aside by that judge unless that judge is absent or unable to act. Petitioner claimed that Judge Bruff violated this Michigan court rule by overturning the earlier decision of Judge Cashen to exclude the statements of co-defendant Davis.

The trial court denied petitioner's motion on the grounds that he had not shown good cause or actual prejudice under MCR 6.508(D) (3) to excuse his failure in raising the issue on appeal.[16] The Michigan Court of Appeals denied petitioner's application for leave to appeal due to his failure to establish grounds for relief from judgment pursuant to MCR 6.508(D).[17] The Michigan Supreme Court subsequently denied his application for leave to appeal because petitioner had failed to meet the burden of establishing entitlement to relief under MCR 6.508(D).[18]

Petitioner's claim is procedurally barred because he failed to raise this issue on his direct appeals to the Michigan Court of Appeals and Michigan Supreme Court. When the state courts "clearly and expressly" rely on a valid state procedural rule to bar appellate review of a federal constitutional claim, federal habeas review of the claim is also barred unless petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged constitutional violation, or can demonstrate that failure to consider the claim will result in a "fundamental miscarriage of justice." *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). If petitioner fails to show cause for her procedural default, it is unnecessary for the court to reach the prejudice issue. *Smith v. Murray*, 477 U.S. 527, 533, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986); *Engle v. Isaac*, 456 U.S. 107, 134 n. 43, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).

Petitioner has not attempted to set forth any cause to explain his state procedural default. Ineffective assistance of counsel may be cause for procedural default. *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). However, attorney error that falls short of constitutional ineffective assistance of

**16.** Opinion of Judge John B. Bruff, dated August 1, 1994.

**17.** Michigan Court of Appeals Docket # 180752.

**18.** Michigan Supreme Court Docket # 102524.

counsel does not constitute "cause" for a procedural default. *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir.1994).

 This Court concludes from a review of the record that appellate counsel was not ineffective in the representation of petitioner on appeal. The Sixth Amendment right to counsel entitles a criminal defendant to the effective assistance of counsel. *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). A criminal defendant is entitled to the effective assistance of counsel whether he is represented by a retained or court appointed attorney. *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *on remand* 723 F.2d 1077 (3rd Cir.1983). To show that he was denied the effective assistance of counsel under **federal** constitutional standards, a defendant must demonstrate that, considering all of the circumstances, counsel's performance fell below the objective standard of reasonableness and so prejudiced defendant that he was denied a fair trial and a reasonable probability exists that, but for counsel's conduct, the result would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *O'Hara v. Wigginton*, 24 F.3d 823 (6th Cir.1994).

 An appellate counsel's failure to raise an appellate issue upon request is not *per se* grounds for reversal unless the defendant can show that the failure constituted ineffective assistance of counsel. *Bowen v. Foltz*, 763 F.2d 191, 194 n. 4 (6th Cir.1985). An attorney assigned to represent a criminal defendant on appeal does not have a constitutional duty to raise every nonfrivolous issue requested by a defendant. *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Tactical choices as to which issues to present on appeal are left to the "sound profes-

sional judgment of counsel". *U.S. v. Perry*, 908 F.2d 56, 59 (6th Cir.1990).

In the present case, petitioner has not demonstrated that his appellate counsel was ineffective in failing to raise the issue of Judge Bruff's reversal of Judge Cashen's ruling. Appellate counsel did raise on appeal the issue that admission of Davis' out-of-court statements at petitioner's trial deprived petitioner of his Sixth Amendment right to confrontation. This was the crux of the alleged error committed by Judge Bruff, not the fact that he overturned Judge Cashen's earlier ruling. Because the Michigan Court of Appeals' determination that the admission of such statements was correct and did not violate petitioner's right to confrontation, Judge Bruff's decision setting aside Judge Cashen's earlier ruling and allowing the admission of such evidence has not prejudiced petitioner and is not grounds to set aside petitioner's conviction.

 Additionally, to the extent that petitioner complains that Judge Bruff violated Michigan state court rules concerning the correction of a trial court error by another trial judge, he has failed to state a claim upon which federal habeas relief can be granted. Violations of state law and procedure which do not infringe specific federal constitutional protections are not cognizable claims under Section 2254. *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Habeas relief will not lie for mere errors of state law. *Lewis v. Jeffers*, 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). Because petitioner's claim here does not allege a violation of the federal constitution, he is not entitled to relief from this Court. Petitioner's second claim must also fail.

**C. Claim # 3.** Petitioner's third claim is that the prosecutor committed misconduct in his closing argument by referring impermissibly to petitioner's decision to remain silent and not testify. In his closing argument, the prosecutor stated the following:

There are things about this case that we will never know. There are secrets locked up in this man. He knows what happened. There are things that are locked inside him and Perry Davis.[19]

When defense counsel objected, the trial court, outside the jury's presence, ruled that the prosecutor's comments were improper and stated that he was going to sustain defense counsel's objection and instruct the jury to disregard the prosecutor's statements as to petitioner's state of mind. The prosecutor assented, in response to the trial court's order, to refrain from further arguments along this line. The trial court then instructed the jury to disregard any comments made concerning petitioner's state of mind and also instructed the jury that petitioner had an absolute right not to testify and that his failure to testify could not be used against him by the jury in their deliberations nor could they infer guilt from his silence.[20]

On appeal, the Michigan Court of Appeals acknowledged that the prosecutor's comments were improper, but held that they were not reversible error because they were made in response to defense counsel's comments in his closing argument that the prosecutor could not really say what happened the night of the killings because he (the prosecutor) was not present.[21]

■ When a petitioner for habeas relief makes a claim of prosecutorial misconduct, the touchstone of due process is the fairness of the trial, not the culpability of the prosecutor. On habeas review, a court's role is to determine whether the conduct was so egregious as to render the entire trial fundamentally unfair. *Serra v. Michigan Department of Corrections,* 4 F.3d 1348, 1355–1356 (6th Cir.1993).

■ The self-incrimination guaranty of the Fifth Amendment and the Fourteenth Amendment due process clause forbids a prosecutor from commenting upon an accused's silence. *Griffin v. State of California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Indirect references to a defendant's failure to testify are constitutionally impermissible if the language used was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be a comment on defendant's failure to testify. *U.S. v. Lyon,* 397 F.2d 505, 509 (7th Cir. 1968); *cert. den.* 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968).

■ However, a prosecutor's comments about an accused's failure to testify does not violate the Fifth Amendment privilege against self-incrimination when the comment is a fair response to defense counsel's argument. *U.S. v. Robinson,* 485 U.S. 25, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988).

The cases cited by petitioner where appellate courts reversed convictions because the accused's silence had been commented upon involved either repeated references by the prosecutor involving the accused's failure to testify, *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *U.S. ex. rel. Burke v. Greer,* 756 F.2d 1295 (7th Cir.1985); *U.S. v. Fearns,* 501 F.2d 486, 490 (7th Cir.1974); or a failure by the trial judge to directly instruct the jury on the defendant's right to remain silent at the time of the offending comment. *U.S. v. Bates,* 512 F.2d 56, 58 (5th Cir.1975).

■ The Court's review of the prosecutor's comments leads it to the conclusion that these statements were not so egregious as to deny petitioner a fair trial. The prosecutor here did not directly comment upon petitioner's exercise of his right to remain silent, although his comment that "there were secrets locked up inside this man" could be construed as an indirect comment upon petitioner's failure to testify. However, the Michigan Court of

---

**19.** Trial Transcript IV, pp. 1417–1418.

**20.** Trial Transcript IV, pp. 1418–1421.

**21.** Michigan Court of Appeals Docket # 107359, dated November 15, 1990.

Appeals conclusion that the prosecutor's statement was not grounds for reversal because it was in response to a statement made by defense counsel in his closing is not contrary to, or an unreasonable application of federal law in light of *U.S. v. Robinson, supra.* Additionally, the prosecutor here made only one isolated reference to petitioner's failure to testify and refrained from further comments about petitioner's silence when instructed to do so by the trial court. Finally, the trial court took immediate corrective action by (1) instructing the jury to disregard the prosecutor's argument about petitioner's state of mind and (2) reminding them that petitioner had the right not to testify and that his silence could not be used as evidence against him in their deliberations.

To the extent that the prosecutor's comments were improper, they are not grounds for relief because they are harmless within the context of the entire trial. Reversal of a criminal conviction to punish prosecutorial misconduct is improper where the error was harmless. A prosecutor's comment as to the accused's failure to testify is harmless error where the evidence and testimony at trial present a compelling case of guilt which has not been successfully rebutted by the presentation of scanty evidence by the accused. *U.S. v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). However, before an error involving the denial of a federal constitutional right can be held harmless in a state criminal case, the reviewing court must be satisfied beyond a reasonable doubt that the error did not contribute to defendant's conviction. *Chapman v. California, supra.*

This Court is satisfied beyond a reasonable doubt that the prosecutor's isolated comment did not contribute to petitioner's conviction in light of the compelling evidence presented against petitioner at trial and in light of the trial court's immediate corrective action. Lawrence Gadomski testified that while incarcerated with petitioner in 1984, petitioner indicated a willingness to join in co-defendant Davis' venture, commenting upon the jewelry and money allegedly owned by victim Hurst. John Butsinas testified that petitioner bragged to him in the holding cell at the Macomb County Circuit Court that he had shot Hurst in the face. John Marantic testified that petitioner confronted him in the Macomb County Jail with a copy of Marantic's statement against Davis, which Davis had passed through his jail cell to petitioner. Petitioner warned Marantic not to testify against Davis. Petitioner also admitted to Marantic that he and Davis killed the victims, but that they "had fucked up" and had to go back and clean up. This statement was similar to the statement of petitioner to Susan Coward on the night of the murders, although at that time he had only indicated that Davis had "fucked up". Petitioner was seen with Davis both before and after the murders. Both Susan Coward and Marcia McLean Davis testified that Davis told them shortly after the killings that he had strangled Kahn and that petitioner had shot Hurst. Although these witnesses in isolation are not the most credible of people, their stories were consistent with each other and with the autopsy findings.

Because the evidence against petitioner was compelling, the prosecutor's isolated indirect reference to his failure to testify, which was immediately rebuked by the trial court, is harmless and petitioner's third claim also fails.

**D. Respondent's Counter-Claim # 1.** Respondent has requested that this Court dismiss the petition for habeas corpus due to petitioner's delay in filing the petition. In light of this Court's opinion that the petition for writ of habeas corpus should be denied based upon the lack of merit to petitioner's claims, this issue is moot.

In any event, this Court declines to dismiss the petition under 28 U.S.C. 2254, Rule 9(a). This rule states:

(a) delayed petitions. A petition may be dismissed if it appears that the state of

which respondent is an officer has been prejudiced in its ability to respond to the petition by delay in filing unless the petitioner shows that it is based on grounds of which he could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the state had occurred.

Respondent claims that it did not receive portions of the trial transcript, namely Lawrence Gadomski's testimony. This Court's Rule 5 materials contained the testimony of Gadomski and the other witnesses, as well as the trial court's evidentiary rulings and the closing arguments of counsel. Additionally, respondent, in this Court's opinion has been able to respond effectively to each and every one of petitioner's claims.

■ Additionally, the cases cited by petitioner, *Ford v. Superintendent, Kentucky State Penitentiary,* 687 F.2d 870 (6th Cir.1982); *Moore v. Smith,* 694 F.2d 115 (6th Cir.1982), involved situations where the petitioner waited over a decade before initiating any appellate proceedings in the state courts prior to filing a petition for habeas relief in federal court. By contrast, petitioner in this case immediately pursued his appeal by right with the Michigan Court of Appeals. When this court affirmed his conviction in 1990, he filed an application for leave to appeal with the Michigan Supreme Court. After the Michigan Supreme Court denied his application in 1991, he filed a writ of certiorari with the United States Supreme Court, which was denied in 1992. After being denied relief with his direct appeals, petitioner filed a motion for relief from judgment in 1994 pursuant to MCR 6.500 *et seq.* and appealed the denial of that motion to the Michigan Court of Appeals and the Michigan Supreme Court. Petitioner has consistently and vigorously prosecuted his appeals in the state and federal courts as allowed by law. The appellate process is a lengthy one and it takes time for each appellate court to render a decision, something beyond petitioner's control. Petitioner also has no control over the mainte-

nance and preservation of the lower court record. This is the State of Michigan's responsibility. Where petitioner is not in a position to induce or prevent such prejudice, this Court will not dismiss the petition under Rule 9(a). *Davis v. Adult Parole Authority,* 610 F.2d 410, 416 (6th Cir. 1979).

This Court declines to dismiss this petition pursuant to 28 U.S.C. § 2254, Rule 9(a).

## IV. *ORDER*

Based upon the foregoing, IT IS ORDERED that the petition for a writ of habeas corpus is **DENIED WITH PREJUDICE.**

## *JUDGMENT*

This action came before this court, the Honorable Paul V. Gadola, District Judge presiding, and the issues having been fully presented and the court being fully advised in the premises, and a decision having been duly rendered,

**IT IS HEREBY ORDERED AND ADJUDGED** that the petitioner, Paul Steven Bruton, take nothing in this action against respondent, and that his petition be **DISMISSED** with prejudice.

**SO ORDERED.**