812 A.2d 514

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**John Wayne ROBINS, Appellant.**

Supreme Court of Pennsylvania.

Re–Submitted Jan. 24, 2002.

Decided Dec. 18, 2002.

Gary B. Zimmerman, Pittsburgh, for John Wayne Robins.

Michael W. Streily, Pittsburgh, Jennifer DiGiovanni, Philadelphia, for Commonwealth of Pennsylvania.

Before ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

*OPINION ANNOUNCING JUDGMENT OF THE COURT*

Justice CAPPY [1]

This Court allowed appeal to consider whether the trial court properly overruled Appellant's Sixth Amendment objection to the admission of non-custodial, extrajudicial statements of a non-testifying accomplice based upon the position that, as declarations against penal interest, the statements were sufficiently reliable to satisfy Confrontation Clause mandates. For the reasons that follow we find that the trial court erred in admitting the hearsay statements of the accomplice over Appellant's Sixth Amendment objections.

The factual and procedural history is as follows: In June of 1995, Coins and Computers, a coin, stamp, and collectibles store in Dormont, Allegheny County, was burglarized, with items valued at nearly $500,000 taken from the store's safe. Upon viewing a news report of the burglary, a citizen advised police that he had witnessed at least two men carrying items to a white van parked in front of the shop during the probable time of the incident. Police then made inquiries at local car rental agencies concerning the use of vehicles matching the van's description. From an interview with an employee of the local Rent–A–Wreck franchise, officers learned that Appellant, John Wayne Robins, had recently rented such a van on two separate occasions. Five days prior to the burglary, Appellant first rented a large white van, but quickly returned it to

1. This opinion was reassigned to this author.

the rental agency, expressing dissatisfaction because the vehicle had too many windows. Three days later (and two days prior to the burglary), Appellant rented a white van without side windows, returning it on the day after the burglary. On both occasions Appellant presented a valid driver's license and paid with a credit card. Police subsequently obtained a search warrant for Appellant's home, where they discovered various locksmithing tools and manuals, as well as a police scanner, all of which were legally in Appellant's possession. Upon questioning, Appellant denied any involvement in the Coins and Computers burglary, but admitted renting the vans, claiming he had done so as a favor to his friend, Barry Auman, who did not possess a valid driver's license and needed the van to transport personal belongings.

After the search of Appellant's residence, the police investigation into the burglary languished for nearly a year until Joseph Downey, a police informant who claimed that he could identify the perpetrators, contacted the investigators. Downey had been incarcerated in the Allegheny County jail in May of 1996, when Auman, Appellant's self-described friend, was arrested for driving under the influence and confined in the same cellblock. Over the next two weeks, Downey and Auman discussed various criminal ventures in which each had participated. Auman confided to Downey that he was responsible for the Coins and Computers burglary the previous year and related various details of the crime, including the involvement of one or more others and their use of a white Rent–A–Wreck van. While not naming his accomplice or accomplices, Auman apparently disclosed details which would implicate Appellant, including references to a partner who was a locksmith, rented the van, lived in South Side, and had a pool in his backyard.[2] Auman also said that he remained in possession of stamps valued at nearly $250,000.

In his discussions with police, Downey sought to use the details obtained from Auman to negotiate his own release from

---

2. These incriminatory aspects of Auman's statements were not made a part of the trial record before the jury, as they were excluded from evidence as further described below.

prison. The government acceded to Downey's terms in exchange for his participation in a sting operation targeting Auman. Pursuant to this arrangement, Downey informed Auman that an acquaintance, described as a stamp collector, would be willing to purchase the stamps in Auman's possession. Downey offered to arrange a meeting with this potential buyer at such time as he and Auman were no longer incarcerated, and Auman expressed a willingness to pursue this plan.

In June of 1996, both men were released from jail,[3] and Downey immediately arranged a meeting at a Pittsburgh hotel between Auman and an undercover Pittsburgh police detective, posing as the collector. Prior to the meeting, Downey was equipped with a hidden microphone, and additional sound equipment was installed in the hotel room. Downey traveled to the hotel with Auman, and, in their conversation, Auman indicated that he had recently injected himself with a narcotic. Inside the hotel room, Downey introduced the detective to Auman under a false name, and Auman soon offered an account of the burglary apparently to demonstrate how he came to be in possession of the stamps. When both Downey and the detective expressed astonishment at the brazenness of the burglary and repeatedly requested details, Auman acquiesced, periodically indicating concern regarding the degree to which he would be incriminating himself by proceeding further with the discussions and transaction.[4] Although Auman did not mention Appellant by name, he referred to a partner and stated that a friend obtained a white van from Rent A Wreck for use in the burglary. At the conclusion of the meeting, Auman promised to produce the stamps for the

3. Auman's release was secured through an attorney recommended by Downey after such time as Downey had assumed the role of a police agent. Downey's involvement in this regard was the subject of a pre-trial motion filed by Auman and is relevant to our discussion, below, concerning the degree of government involvement in the production of Auman's statements. *See infra.*

4. For example, Auman asked whether there were any recording devices present; equivocated as to whether he would be willing to produce photographs of the stamps for the sake of confirmation, since this would be incriminating to him; and indicated that the stamps must not be publicly marketed as they were traceable.

detective's inspection before consummating the sale. Subsequently, however, Auman contacted the detective to inform him that he could no longer locate the stamps and that they were not available for sale. Thereafter, police arrested Auman, and, subsequently, Appellant.

Appellant and Auman were scheduled for a joint trial; however, shortly before the trial date, Auman and the Commonwealth entered into a plea agreement, and Auman was convicted and sentenced for burglary and related offenses. The Commonwealth then proceeded with trial against Appellant on the sole charge of conspiracy to commit burglary. The Commonwealth planned to use Auman's statements as evidence against Appellant. Appellant filed an omnibus pre-trial motion, seeking to exclude from evidence, *inter alia*, both Auman's statements to Downey while incarcerated and the tape-recorded conversation of the hotel meeting.[5]

Appellant contended that the statements were inadmissible hearsay and challenged any assertion by the Commonwealth that they qualified for admission pursuant to the coconspirator exception to the hearsay rule. The Commonwealth initially maintained that the coconspirator exception was indeed implicated, since at least a portion of the statements were made in furtherance of the conspiracy, or, more specifically, in an attempt to market the stolen merchandise. The trial court rejected this argument, however, on the ground that the Commonwealth's proffer was insufficient to establish an ongoing conspiracy at the time of Auman's statement, due to the lapse of a year's time since the burglary.[6]

---

5. The record does not contain any discussion as to Auman's unavailability as a witness. The parties conducted the pre-trial hearing on the admissibility of the statements in accordance with their agreement that Auman was unavailable to testify. The trial court seemingly accepted this apparent stipulation, and the parties have never challenged the issue of availability. The question of availability is therefore not before this Court.

6. The Commonwealth did not pursue the argument that the statements were admissible under the coconspirator exception on appeal. In supplemental briefs filed at the request of this Court, the Commonwealth concedes that the trial court did not abuse its discretion in rejecting the argument for admissibility of the hearsay statements

The Commonwealth then asserted its alternative position that the statements were in the nature of declarations against Auman's penal interest, and, as such, were admissible over and against Appellant's objections on both hearsay and Confrontation Clause grounds. The trial court endorsed this argument in part, but concluded that only those portions of the statements that directly incriminated Auman would be admitted. The court determined that other portions, such as those that would directly or by implication disclose Appellant's involvement in the burglary, were not sufficiently adverse to Auman's interest to qualify for admission under the exception. The trial court referenced *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), in its various rulings on the subject. Thus, the court permitted Downey to testify regarding the jailhouse confession, but prohibited him from mentioning any of Auman's comments implicating Appellant directly or by contextual implication. Similarly, it allowed the Commonwealth to air before the jurors an edited version of the taped conversation, which eliminated various portions of the discussion referencing Appellant by implication.[7]

The Commonwealth's strategy was to establish Auman's guilt, and to connect Appellant through his admitted association with Auman and, in particular, in connection with the rental of the vehicle used in the crime. As such, Auman's statements were clearly a central aspect of the Commonwealth's case.

The jury returned a verdict of guilty, and the court sentenced Appellant to five to ten years of imprisonment and

pursuant to the coconspirator exception. (Supplemental Brief of Appellee at p. 12).

7. At the time of oral argument before this Court, neither a transcript of the taped conversation or the actual recording could be located. Subsequently, however, the common pleas court provided a transcript of the conversation, with portions marked apparently to indicate the sections that the trial court had excluded. Although the description of the taped conversation, above, is derived in part from this document, we note that the detail provided is helpful primarily by way of background. Since there is no assurance that the hand-marked transcription derives from the trial record, the disposition, below, is not dependent upon the document as definitively establishing the scope of the redactions.

restitution of $222,000. On appeal, Appellant argued that the trial court erred in admitting the untested hearsay versions of Auman's statements. Appellant maintained that such admission violated his right to confront a witness against him pursuant to both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution.[8] While the Superior Court affirmed the conviction by memorandum opinion, this Court subsequently granted allocatur and remanded the matter to the Superior Court for reconsideration in light of *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999)(plurality opinion), in which the United States Supreme Court determined that the admission of certain inculpatory statements by a non-testifying coconspirator offended a defendant's right of confrontation. *See Commonwealth v. Robins*, 558 Pa. 104, 735 A.2d 702 (1999) *(per curiam )*.

On remand, the Superior Court again affirmed the judgment of sentence. The court emphasized the United States Supreme Court's efforts in Confrontation Clause jurisprudence to balance the government's need for evidence of extrajudicial statements against a criminal defendant's interest in cross-examination as a means of truth finding. The Superior Court recognized that, as a result of such balancing, the Supreme Court had determined that out-of-court statements which can be said to fit a "firmly rooted" exception to the hearsay rule generally may be admitted as against a Confrontation Clause challenge, although such statements are untested by cross-examination of the declarant. The Superior Court accepted Appellant's argument that Auman's statements, while certainly against his own penal interest, did not fall within a firmly rooted hearsay exception when offered against

---

8. In addition to his Sixth Amendment challenge, Appellant also has styled his claim under Article I, Section 9 of the Pennsylvania Constitution, the state constitutional analogue. While this Court previously has distinguished state confrontation clause jurisprudence from that prevailing under federal constitutional precepts, *see Commonwealth v. Ludwig*, 527 Pa. 472, 594 A.2d 281, 284 (1991), as we find that Appellant prevails under his Sixth Amendment argument, and state constitutional law can provide no greater relief, we will not engage in a distinct state constitutional analysis.

Appellant. Nevertheless, the Superior Court distinguished *Lilly* on the basis of the trial court's decision to exclude references that would implicate Appellant directly or by implication. *See Commonwealth v. Robins*, No. 856 Pittsburgh 1997, 1999 WL 1610407, *slip op.* at 9 (Pa.Super. Dec. 22, 1999)(indicating that "redaction is an appropriate method of safeguarding a defendant's Sixth Amendment rights while retaining the necessities of the case"). Also citing to *Bruton*, the Superior Court concluded:

> Appellant ignores the fact that the trial judge in his case carefully redacted Auman's statement to omit Appellant's name and even some contextual implications that might have been properly left in the redacted statement. In *Lilly*, the statement at issue was unredacted. Here, Auman's statement was redacted in accordance with *Bruton*.

> In the present case, Appellant's Sixth Amendment rights were preserved by [the trial court's] careful and conscientious redaction of Auman's statements. The sufficiency of [the] redaction and the factual differences between the instant case and *Lilly* lead us to conclude that Auman's statements were properly admitted.

*Id.* at 10 (citations omitted).

Presently, Appellant equates Auman's hearsay statements with those deemed to have been presumptively unreliable and inadmissible in *Lilly*, contending that *Lilly* broadly established that the penal interest exception does not meet the requirements of a firmly rooted hearsay exception under Confrontation Clause principles. Appellant also asserts that the circumstances under which Auman's statements were made do not evince the sort of reliability that would render adversarial testing unnecessary. Specifically, Appellant describes the jailhouse confession as "unreliable chats and bragging between two criminals," and the taped conversation as untrustworthy, since the situation was engineered by the Commonwealth and the circumstances encouraged the most expedient version of events rather than the most truthful. Additionally, Appellant emphasizes Auman's exposure to narcotics prior to the hotel conversation.

In contrast, the Commonwealth views this case as analytically distinct from *Lilly* in several respects. First, the trial court redacted statements implicating Appellant, permitting the jury to learn of only those portions that internally inculpated only the declarant (Auman), and removing portions that might be deemed unreliable because they tended to shift or spread blame to others. The Commonwealth also argues that the declarations in this case were different in kind from those at issue in *Lilly,* since Auman's statements were not knowingly made to law enforcement officials, but rather, were made in a non-custodial setting to persons whom Auman believed he could trust. According to the Commonwealth, the non-custodial aspect should ameliorate any concern that the statements were fabricated to lessen criminal culpability. Although the Commonwealth appears to acknowledge that non-self-inculpatory, custodial statements are not within a firmly rooted exception to the hearsay rule, it asserts that self-inculpatory, non-custodial ones may be deemed to fit within a firmly rooted exception. In the event that this Court would find to the contrary, the Commonwealth takes the position that the circumstances surrounding Auman's statements manifest particularized guarantees of trustworthiness and, for that reason also, should be deemed to meet Confrontation Clause requirements. With regard to the involvement of illicit drugs, the Commonwealth relies upon a factual determination by the trial court that Auman did not suffer from impairment sufficient to undermine the reliability of his statements.

The Confrontation Clause of the Sixth Amendment, applicable to the states through the due process clause of the Fourteenth Amendment, provides that in "all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *Idaho v. Wright,* 497 U.S. 805, 813, 110 S.Ct. 3139, 3145, 111 L.Ed.2d 638 (1990)(citing U.S. Const. amend. VI). In general, the Supreme Court has indicated that the Clause reflects a preference for face-to-face confrontation at trial, and that the primary interest protected is the right of cross-examination. *See Ohio v. Roberts,* 448 U.S. 56, 64, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980); *see*

*also Lilly,* 527 U.S. at 123–24, 119 S.Ct. at 1894 (Stevens, J.) (stating that "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact" (quoting *Maryland v. Craig,* 497 U.S. 836, 845, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (1990))).

One important facet of Confrontation Clause jurisprudence concerns the spillover effect that may occur at a joint trial from a limited admission of incriminatory statements through an extrajudicial confession of a non-testifying codefendant. The seminal decision in this line is *Bruton,* 391 U.S. at 123, 88 S.Ct. at 1620, which presently was invoked by both the Superior Court and the trial court in their respective determinations. The rule established in *Bruton* prevents the use of a statement of a non-testifying codefendant which directly inculpates one or more other defendants at a joint trial, but which has been deemed inadmissible against such defendant(s), based on the Sixth Amendment right to confront the witness. *See id;*[9] *see also Gray v. Maryland,* 523 U.S. 185, 188, 118 S.Ct. 1151, 1153, 140 L.Ed.2d 294 (1998). Subsequently, the United States Supreme Court limited the scope of the *Bruton* rule in circumstances involving redacted confessions. *See*

---

**9.** At the trial level in *Bruton,* the Court determined that the confession of a non-testifying codefendant (also directly implicating the defendant, Bruton), was admissible solely against the co-defendant, but, as concerned Bruton, constituted inadmissible hearsay. *See Bruton,* 391 U.S. at 124–25, 88 S.Ct. at 1621–22. The trial court therefore admitted the entire confession into evidence as against the co-defendant, but instructed the jury that the statement was to be disregarded in determining Bruton's guilt or innocence. *See id.* The issue before the United States Supreme Court was whether, in a joint trial, such a limiting instruction could be deemed sufficient, in and of itself, to cure the prejudice inherent in such an untested, direct, incriminating statement. *See id.* at 135–36, 88 S.Ct. at 1628 (describing the context of the case as one in which the "powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial"). The Court answered this question in the negative. *See id.* at 137, 88 S.Ct. at 1628 (concluding that "in the context of a joint trial we cannot accept the limiting instruction as an adequate substitute for petitioner's constitutional right of cross-examination").

*Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987).

The present situation, however, is not concerned with the effectiveness of limiting instructions and the prevention of spillover prejudice to a defendant when his codefendant's confession is admitted against the codefendant at a joint trial. Although Appellant initially was slated to be tried jointly with Auman, as the trial date approached, Auman pled guilty and was convicted and sentenced; therefore, the jury was charged with determining only Appellant's guilt or innocence. There was not and could not have been an instruction to the jury precluding Auman's hearsay statements from being considered only as to Auman's culpability and not Appellant's criminal liability, as this would have rendered the statements wholly irrelevant to the trial at hand.[10] Rather, the Commonwealth took the position, and the trial court accepted, that Auman's statements were admissible as substantive evidence against Appellant. This situation is not one where the spillover prejudice from a non-testifying codefendant's confession can be cured by a *Bruton* redaction. The Superior Court, therefore, erred in concluding that the redactions to Auman's statements settled the salient Sixth Amendment inquiry. *Accord Lee v. Illinois,* 476 U.S. 530, 542, 106 S.Ct. 2056, 2063, 90 L.Ed.2d 514 (1986)(noting that "this is not strictly speaking a *Bruton* case because we are not here concerned with the effectiveness of limiting instructions in preventing spill-over prejudice to a defendant when his codefendant's confession is admitted against the codefendant at a joint trial").

The more directly relevant line of Sixth Amendment precepts are embodied in the United States Supreme Court's decision in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), and developed at length in *Lilly.* Briefly, the United States Supreme Court has maintained that a literal application of the Confrontation Clause would impose an unmanageable burden upon the administration of justice, *see*

10. At trial, the prosecutor expressed this point as follows: "there's no point in my putting the statement in unless I can implicate [Appellant], obviously."

*Roberts*, 448 U.S. at 64, 100 S.Ct. at 2538, and therefore, has implemented a set of limiting principles which are not derived directly from the constitutional text.

First, the Court has described the Clause as establishing a "rule of necessity," requiring, in the usual case, a demonstration of unavailability of a witness whose statement the government seeks to admit. *See id.* at 65, 100 S.Ct. at 2538.[11] Second, the Court has determined that certain hearsay statements marked with sufficient indicia of reliability may be admitted despite the absence of the witness from trial over a Sixth Amendment challenge. *See id.* at 65–66, 100 S.Ct. at 2539. Such indicia of reliability are deemed present without the need for further inquiry where the statement fits within a "firmly rooted" exception to the hearsay rule, or, alternatively, where the circumstances in which the statement was made manifest particularized guarantees of trustworthiness such that adversarial testing would be expected to add little, if anything, to the statement's reliability. *See Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539; *see also Lilly*, 527 U.S. at 136, 119 S.Ct. 1887, 144 L.Ed.2d 117. Hearsay statements outside firmly rooted exceptions are deemed presumptively unreliable for purposes of the Sixth Amendment, and such presumption is not easily overcome. *See Lee*, 476 U.S. at 543, 106 S.Ct. at 2063.

The primary federal constitutional questions presented here concern whether: (1) the declarations against penal interest exception to the hearsay rule pursuant to which Auman's statements were admitted into evidence at Appellant's trial qualifies as a firmly rooted exception; and, if not, (2) whether the circumstances in which the statements were made manifest particularized guarantees of trustworthiness. The Su-

11. In subsequent decisions, the Supreme Court appears to have retreated from this statement as phrased in *Roberts*. *See, e.g., United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986). It remains clear, however, that, while unavailability may not be viewed as an absolute requirement of the Confrontation Clause, a demonstration is necessary where unavailability is an essential component of an underlying hearsay exception invoked by the government in an effort to surmount a Sixth Amendment challenge.

preme Court's recent plurality decision in *Lilly* bears upon these questions.

Concerning the question of firm rooting, on reargument in *Commonwealth v. Young*, 561 Pa. 34, 748 A.2d 166 (2000), this Court acknowledged that the lead opinion in *Lilly* represented the view of a plurality of Justices but nonetheless was able to discern a majority holding on a point of law from among the various expressions.[12] This Court summarized that holding as follows: "[S]tatements made to the authorities by a non-testifying accomplice which inculpate the defendant more than the accomplice are not admissible pursuant to a firmly rooted exception to the hearsay doctrine and thus do not satisfy the first prong of the *Roberts* test." *Young*, 748 A.2d at 192. This Court also recognized the division of opinion among the members of the *Lilly* Court concerning the reasoning by which this holding should be discerned. The two primary expressions concerning the assessment as to firm rooting are represented by the lead opinion, authored by Mr. Justice Stevens, and an opinion concurring in the judgment, authored by Mr. Chief Justice Rehnquist.

Justice Stevens acknowledged that the categorization of a statement as a declaration against penal interest defines too large a class for meaningful Confrontation Clause assessment and therefore employed subcategories in his analysis. *See Lilly*, 527 U.S. at 127, 119 S.Ct. at 1895 (Stevens, J.). The relevant subcategory is the use of a third-party declaration by the government as evidence to establish the guilt of an alleged accomplice of the declarant.[13] The plurality described the practice of admitting statements against interest for such purpose as "of quite recent vintage," *id.* at 131, 119 S.Ct. at

**12.** The factual and procedural history of *Lilly* appears in *Young* at pages 189 through 190 of the Atlantic Reporter 2d.

**13.** It seems clear that, in defining the pertinent subcategory as such, the Supreme Court was referring to the use of accomplices' confessions as substantive evidence against the defendant. The other two subcategories of declarations against penal interest defined and discussed in *Lilly'*s lead opinion are the use of a statement: (1) as a voluntary admission against the defendant; and (2) as exculpatory evidence offered by a defendant who claims that the declarant committed, or was involved in, the offense. *See Lilly*, 527 U.S. at 127, 119 S.Ct. at 1895.

1897, noting that the Supreme Court had "consistently either stated or assumed that the mere fact that one accomplice's confession qualified as a statement against his penal interest did not justify its use as evidence against another person." *Id.* at 128, 119 S.Ct. at 1896 (Stevens, J.) (citations omitted); *cf. Gray,* 523 U.S. at 194–95, 118 S.Ct. at 1156 (observing that the use of an accomplice's confession "creates a special, and vital, need for cross-examination"). Justice Stevens determined that the accomplice statement category of hearsay encompasses statements that are inherently unreliable, namely, accomplices' confessions that directly incriminate defendants. *Id.* at 131, 119 S.Ct. at 1897 (stating that "we have over the years 'spoken with one voice in declaring presumptively unreliable accomplices' confessions that incriminate defendants'" (citation omitted)). Justice Stevens noted that at least the non-self-inculpatory portions of such statements have been deemed presumptively unreliable, since they may represent attempts to minimize the declarant's culpability. *See id.* at 132–33, 119 S.Ct. at 1898.

In concurring in the judgment only, Chief Justice Rehnquist took issue with the breadth of the above analysis, which he believed would impose an absolute ban on the government's use of accomplice confessions that implicate a codefendant. *See Lilly,* 527 U.S. at 145, 119 S.Ct. at 1904 (Rehnquist, C.J., concurring in the result). Chief Justice Rehnquist posited that, since the statements at issue in the case were wholly non-self-inculpatory, it was inappropriate to preclude consideration in a future case of whether custodial statements that equally inculpated the accomplice and defendant, or non-custodial statements, satisfied a firmly rooted hearsay exception under *Roberts. See id.*[14]

14. Mr. Justice Souter, Madame Justice Ginsburg, and Mr. Justice Breyer joined the relevant portions of the lead opinion. Madame Justice O'Connor and Mr. Justice Kennedy joined Chief Justice Rehnquist's opinion, and Mr. Justice Thomas indicated his agreement that the Confrontation Clause should not be interpreted to impose a complete ban on the government's use of accomplice statements that incriminate a criminal defendant. Justice Thomas reiterated his view that the Confrontation Clause is implicated by extrajudicial statements only to the extent that they are contained in formalized testimonial

As recognized in our opinion in *Young,* the holding in *Lilly,* is a narrow one, and its scope is confined only to those hearsay declarations against penal interest that fall within the subcategory of statements made to the authorities by a codefendant that shift or spread the blame to the coconspirators. Thus, although *Lilly* is instructive to our analysis, it is not dispositive in determining if Auman's declarations against penal interest, which were largely self-inculpatory, but also inculpated Appellant, and not knowingly uttered to a person in authority, fall within a firmly rooted exception to the hearsay rule.

 Initially we note that while the question of whether Auman's statements fall within the declaration against penal interest exception is purely a matter of state law, the question of firm rooting for purposes of Sixth Amendment jurisprudence is apparently to be treated as one of federal law. *See Lilly,* 527 U.S. at 125, 119 S.Ct. at 1894 (Stevens, J.). A hearsay exception is firmly rooted if longstanding judicial and legislative experience has shown that virtually any evidence within it comports with the substance of the constitutional protection. *See Wright,* 497 U.S. at 817, 110 S.Ct. at 3147; *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539. In this regard, the *Roberts* test focuses upon exceptions, which on their terms are widely recognized and contain such assurance of reliability that adversarial testing could be expected to add little. *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539. A firmly rooted hearsay exception, therefore, is one that does not require corroboration to support its reliability as a prerequisite to admission. *Id.* We must examine the penal interest exception in accordance with the definitions of firmly rooted found in *Lilly* and *Roberts.*

The rationale underlying the penal interest exception is that a person would not ordinarily make an untrue statement

materials. *See Lilly,* 527 U.S. at 143, 119 S.Ct. at 1903. Justice Scalia has separately subscribed to the view that informal, non-custodial statements do not implicate the Confrontation Clause. *See White v. Illinois,* 502 U.S. 346, 358–66, 112 S.Ct. 736, 744–48, 116 L.Ed.2d 848 (1992) (Thomas, J., joined by Scalia, J., concurring in part and concurring in the judgment).

contrary to his own liberty interests. Although statements against proprietary or pecuniary interest possess long-standing common law roots, *see generally* 2 McCORMICK ON EVIDENCE § 317, at 318 (1999), statements against penal interest were not recognized in early common law as a basis supporting the admission of hearsay evidence. *See id.* § 318, at 320–21. Over time, however, a limited exception developed primarily in instances where a criminal defendant sought to introduce a third-party confession as exculpatory evidence.[15] However, corroboration of the statement was considered essential to counter the possibility that statements were fabricated in an effort to aid an accused. *See* 2 McCORMICK ON EVIDENCE § 317, at 322–23.

Pennsylvania followed this general trend, and permitted the admission of declarations against penal interest for exculpatory purposes, providing they were supported by sufficient assurance of their reliability. *See Williams*, 537 Pa. at 26 n. 8, 640 A.2d at 1263 n. 8; *Commonwealth v. Bracero*, 515 Pa. 355, 528 A.2d 936 (1987) (plurality opinion); *Commonwealth v. Colon*, 461 Pa. 577, 337 A.2d 554 (1975) (plurality opinion); *Commonwealth v. Nash*, 457 Pa. 296, 324 A.2d 344 (1974) (plurality opinion); *Commonwealth v. Hackett*, 225 Pa.Super. 22, 307 A.2d 334 (1973). *See generally* DAVID F. BINDER, BINDER ON PENNSYLVANIA EVIDENCE § 8.04, at 499 (2d ed.2001). Even when the Commonwealth relies upon the penal interest exception to permit the introduction of inculpa-

**15.** *See* 2 McCORMICK ON EVIDENCE § 318, at 322 ("During the course of the expansion of the hearsay exception to include declarations against penal interest, the situation principally examined was whether a confession or other statement by a third person offered by the defense to exculpate the accused should be admissible."). Many of the seminal decisions concerned the constitutional implications of precluding a criminal defendant from offering such evidence. *See, e.g., Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); 29A AM JUR.2D EVIDENCE § 789 (1994)(stating that, "in the case of a confession by one person which exculpates the accused, the exception for declarations against interest must be recognized as a matter of due process"). Confrontation Clause issues are not implicated in the exculpatory evidence situation, since the government possesses no right to confrontation equivalent to that of a criminal defendant. *See generally* 5 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 804.06 (1997).

tory evidence, a requirement of corroboration is attached. *See, Commonwealth v. Yarris,* 557 Pa. 12, 731 A.2d 581 (1999). The recently adopted Pennsylvania Rules of Evidence encapsulate the requirement that in this Commonwealth the introduction of statements pursuant to the penal interest exception are subject to corroboration before their admissibility can be considered. *See* Pa.R.E. 804(b)(3).[16]

Returning to the criteria for firmly rooting, expressed in *Roberts* and *Lilly,* we note that in every circumstance where the admission of testimony pursuant to this exception is considered, corroboration independent of the statement itself is necessary. Therefore, we find that based upon the definition of firmly rooted as expressed by federal law, the hearsay exception for declarations against penal interest is not firmly rooted under Pennsylvania law.

▉▉▉ Where the hearsay exception at issue is not firmly rooted, an alternative method for establishing Confrontation Clause compliance is through the demonstration of reliability of a hearsay statement by reference to particularized guarantees of trustworthiness such that cross-examination would be of "marginal utility" in determining truthfulness. *See Lilly,* 527 U.S. at 136, 119 S.Ct. at 1900 (Stevens, J.); *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539. As previously noted, the primary interest protected by the Confrontation Clause is the right of cross-examination, which, in an oft-quoted passage, Professor John Henry Wigmore described as "the greatest legal engine ever invented for the discovery of the truth." 5 Wigmore, Evidence § 1367, at 32. A demonstration of trustworthiness is of particular importance where the hearsay statement is that of an accomplice implicating his coconspirator; as such statements are viewed with great suspicion and are presumptively unreliable. *See Lee,* 476 U.S. at 543, 106 S.Ct. at 2063.

16. We note that Federal Rule of Evidence 804(b)(3), governing the admission of statements against penal interest, upon which the Pennsylvania Rule was modeled, limits the requirement of corroboration to statements offered by the defendant for exculpatory purposes.

■ The circumstances to be examined in this inquiry are limited to those attendant to the making of the statement, *Wright,* 497 U.S. at 819, 110 S.Ct. at 3148; and in this regard, the use of hindsight or "bootstrapping" based upon independent evidence is proscribed. *See id.* at 820, 110 S.Ct. at 3149; *see also Young,* 561 Pa. at 82, 748 A.2d at 191. Although the United States Supreme Court has declined to endorse any specific enumeration of factors to be considered, courts have evaluated: the circumstances under which the statements were uttered, including the custodial/non-custodial aspect of the setting and the identity of the listener; the contents of the statement, including whether the statements minimize the responsibility of the declarant or spread or shift the blame; other possible motivations of the declarant, including improper motive such as to lie, curry favor, or distort the truth; the nature and degree of the "against interest" aspect of the statements, including the extent to which the declarant apprehends that the making of the statement is likely to actually subject him to criminal liability; the circumstances or events that prompted the statements, including whether they were made with the encouragement or at the request of a listener; the timing of the statement in relation to events described; the declarant's relationship to the defendant; and any other factors bearing upon the reliability of the statement at issue.

The Commonwealth argues that the totality of the circumstances favor a finding of reliability as to Auman's statements. In support of its position, it points to the following factors: the statements clearly were self-inculpatory in that the details placed Auman at the scene of the burglary as an active coconspirator and participant; Auman plainly perceived that the statements were incriminating, as he made his understanding in this regard express throughout the taped hotel conversation; there would appear to have been minimal coercive pressures; the statements are generally internally consistent; there was no apparent incentive or intent to spread or shift blame or to otherwise minimize personal culpability; and reference to Auman's accomplice(s) was limited to the context

of his narration of the events of the burglary, with Auman withholding their actual identity.

On the other hand, Appellant asserts that the totality of the circumstances militate against a determination of reliability. Appellant focuses on factors distinct from those relied upon by the Commonwealth, such as the fact that: Auman's statements were made more than a year after the burglary, allowing ample time for reflection; the informant, Downey, prompted Auman to obtain information about the crime for Downey's personal benefit; Auman may have been motivated to speak about the burglary to impress fellow criminals, or to defraud the ostensible buyer by reference to the facts of a highly publicized burglary; the government was involved in the production of the most damaging of Auman's statements, the taped hotel conversation, which was specifically procured for use against Auman and any confederates in criminal prosecution; and further, that Auman may have been under the influence of narcotics.

Confrontation Clause analysis starts with the proposition that in-court testimony from a witness who is subject to cross-examination evinces the degree of reliability against which untested statements should, as a general rule, be measured. This then is the backdrop for our assessment of the indicia of reliability surrounding Auman's out of court statements. While there is no required list of factors for conducting this evaluation, we note the commonly referenced ones listed supra, and thus begin with a consideration of the basic components, of when and where the statements were made, to whom they were made and what was said.

The statements were made a year after the burglary had been committed. Distance from the critical event supports a conclusion that the speaker had time to reflect, rather than a finding that the statements were spontaneous or excited utterances tending to enhance reliability. The initial conversations occurred in a jail cell where Auman was incarcerated on charges unrelated to the burglary. Auman's confidant was his cellmate, Downey. Auman and Downey had no previ-

ous relationship, a factor that would militate against a conclusion that they shared a bond inspiring mutual trust. While the statements do inculpate Auman in criminality, his motive in doing so may have been to enhance his standing in the eyes of his cellmate, rather than to speak truthfully of his role in a serious crime. This interpretation of the conversations between Auman and Downey is reinforced by the fact that Downey, for his own purposes, was an attentive listener who encouraged Auman to reveal incriminating details of the burglary. Conversations between cellmates do not carry any special indicia of reliability. In that setting, Auman's statements giving him a pivotal role in a sensational, and still unsolved burglary do not carry sufficient indicia of reliability.

The other setting for the statements was the hotel room, where Auman believed he was meeting a buyer for the stolen stamps. The prelude to that encounter is important in viewing the whole picture. Auman, now out of jail with the aid of his cellmate Downey, had to continue the picture of the notorious burglar who still has stolen stamps to unload he had painted of himself in the jail cell. Once in the hotel room, Auman continued to discuss his exploits but failed to produce proof that he possessed the merchandise. Auman displayed awareness that his conversation about the burglary exposed him to criminal liability, and he limited his references to his cohorts rather than shift and spread the blame. While in a custodial interrogation a coconspirator confession that shifts the blame is suspicious because it is probably motivated by an effort on part of the speaker to limit his own liability, in a noncustodial setting, where the speaker may be trying to enhance his image before other criminals, the opposite conclusion is just as likely. Given that the inculpatory statements followed upon the likely braggadocio of the jail cell conversations, the fact that the "buyer" was the one who arranged the meeting, not Auman, and that Downey, who was acting on his own personal motivations, orchestrated the entire encounter, a finding of trustworthiness is highly suspect.[17]

---

17. Although Appellant argues that Auman was under the influence of narcotics during the hotel room encounter, we are compelled to credit

Considering the totality of the circumstances, weighed against the Confrontation Clause concerns discussed above, we find the statements of Auman lack sufficient indicia of reliability. Therefore, the hearsay statements of Auman should not have been admitted against Appellant. Accordingly, the judgment of sentence is reversed and the matter remanded for a new trial.

Jurisdiction is relinquished.

Justice SAYLOR files a concurring opinion.

Justice CASTILLE files a dissenting opinion in which Justice NEWMAN joins.

Justice EAKIN files a dissenting opinion in which Justice CASTILLE and Justice NEWMAN join.

Justice SAYLOR, concurring.

I join the reasoning of the lead opinion supporting its conclusion that the Pennsylvania hearsay exception for declarations against penal interest is not a firmly rooted one for purposes of the Sixth Amendment, Confrontation Clause jurisprudence. Concerning the question of particularized guarantees of trustworthiness, however, while ultimately I am in alignment with the lead's disposition, my reasoning is different.

At the outset, I note that there are considerable collateral assurances of reliability extrinsic to Auman's hearsay declarations, in particular, his guilty plea to the offenses that are the subject of those statements. *See generally United States v. Moskowitz,* 215 F.3d 265, 269 (2d Cir.), *cert. denied,* 531 U.S. 1014, 121 S.Ct. 571, 148 L.Ed.2d 489 (2000) (emphasizing the reliability of a plea allocution, as it directly subjected the declarant to a lengthy prison term). Moreover, the trial court assiduously limited Downey's testimony and redacted the

the trial court's factual assessment concerning the limited impact of this factor. *Cf. Lilly,* 527 U.S. at 139, 119 S.Ct. at 1901 (Stevens, J.)(noting that the declarant's recent use of alcohol contributed to the unreliability of his statements),

taped conversations out of a concern for fundamental fairness.[1] This is, therefore, a unique situation where there is both a non-custodial statement, and the statements have been tailored to omit any direct and, in all but the most general sense, indirect, references to the defendant. Nevertheless, as the lead opinion observes, the Commonwealth's theory of proof was to demonstrate that Auman committed the burglary, then to connect Appellant to Auman primarily in terms of the rental of the van used in the crime. Auman's confessions therefore constituted a central and critical aspect of the Commonwealth's case against Appellant. Thus, while his confession as admitted into evidence was not accusatory in relation to Appellant, through the hearsay statements he nevertheless functioned as a witness against Appellant for purposes of the Confrontation Clause.[2] Accordingly, although it may

1. Although the trial court erroneously cited *Bruton* as authority for curtailing the Commonwealth's presentation of Auman's statements, *see* Opinion Announcing the Judgment of the Court, *op.* at 521, the effect was to ameliorate questions related to portions which might be deemed unreliable in that they had the effect of spreading or shifting blame. *Cf. Williamson v. United States,* 512 U.S. 594, 600–01, 114 S.Ct. 2431, 2435, 129 L.Ed.2d 476 (1994) (holding that Fed.R.Evid. 804(b)(3) "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory"). While some courts have rejected *Williamson*'s requirement to exclude certain collateral portions of a statement against interest for purposes of state evidentiary law, *see, e.g., People v. Newton,* 966 P.2d 563, 578 (Colo.1998) (concluding that "the surgical precision called for by *Williamson* is highly artificial and nearly impossible to apply" and holding that "a narrative's precise statement against penal interest and related, collaterally neutral statements are admissible under CRE 804(b)(3)"), the trial court's efforts in the present case have obviated any question in this regard.

2. *Accord* L.C. Kirkpatrick, *Confrontation and Hearsay: Exemptions From The Constitutional Unavailability Requirement,* 70 Minn. L.Rev. 665, 680–81 (Feb.1986) (noting that "'nonaccusatory' hearsay statements can sometimes have enormous persuasive impact and be the decisive factor in an adjudication of guilt[;][t]o exempt such statements from the right of confrontation may be too narrow a reading of the sixth amendment"); *id.* at 711 n. 85 ("It is doubtful that a defendant convicted on the basis of such . . . evidence could be persuaded that the hearsay declarant was not a witness against him."). *But see Bruton v. Phillips,* 64 F.Supp.2d 669, 682 (E.D.Mich.1999) (concluding that "[b]ecause the statements made . . . did not even mention petitioner, their admission into evidence did not violate the Sixth Amendment right to confrontation"). Notably, in the present case, the Commonwealth has

seem somewhat counterintuitive in the circumstances, I agree with the lead that the Court is obliged to proceed with the remaining, relevant Sixth Amendment analysis, confining the inquiry to the circumstances surrounding Auman's statements.

The lead opinion aptly identifies factors favoring a finding of reliability as to Auman's statements, including their self-inculpatory aspects; absence of coercion; internal consistency of the statements; absence of incentive or intent to shift or spread blame; and Auman's care not to reveal the identity of his accomplice. *See* Opinion Announcing the Judgment of the Court, *op.* at 526. Further, on balance, and in view of the other circumstances presented, I deem Downey's identity as a confidant and the detective's role as an ostensible stamp collector/purchaser to be factors also tending to favor reliability. Indeed, on review of decisions in other jurisdictions in which courts have found particularized guarantees of trustworthiness associated with non-custodial confessions,[3] the analysis frequently emphasizes the against-the-penal-interest aspect of the statements, the identity of the listener(s) as outside the sphere of law enforcement, and the making of the statements at a time when a blame-shifting motive was unlikely. A number of the decisions have involved covert police operations.[4] Others involve confessions to cell mates. *See,*

not taken the position that the Confrontation Clause is not implicated because Auman's statements are nonaccusatory with respect to Appellant.

3. *See, e.g., Denny v. Gudmanson,* 252 F.3d 896, 902–04 (7th Cir.), *cert. denied,* 534 U.S. 938, 122 S.Ct. 311, 151 L.Ed.2d 232, (2001); *United States v. Tocco,* 200 F.3d 401, 416 (6th Cir.2000); *United States v. Boone,* 229 F.3d 1231, 1234 (9th Cir.2000), *cert. denied,* 532 U.S. 1013, 121 S.Ct. 1747, 149 L.Ed.2d 669 (2001); *United States v. Shea,* 211 F.3d 658, 660 (1st Cir.2000); *United States v. Westmoreland,* 240 F.3d 618, 627–28 (7th Cir.2001); *United States v. Robbins,* 197 F.3d 829, 840 (7th Cir.1999); *United States v. Matthews,* 20 F.3d 538, 546 (2d Cir.1994); *United States v. Barone,* 114 F.3d 1284, 1302 (1st Cir.1997).

4. *See, e.g., United States v. Bryce,* 208 F.3d 346, 350–51 (2d Cir.1999); *State v. Parris,* 98 Wash.2d 140, 654 P.2d 77, 83 (1982). For example, in *Parris,* the court employed the following reasoning:

Here the declarant ... undoubtedly knew that he was engaged in criminal conduct and that his statements would be against his interests were they to be repeated in court. His statements were all made in furtherance of the criminal act and were relevant in proving that a

*e.g., Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970); *Westmoreland,* 240 F.3d at 627–28. Consistent with the observations of Mr. Justice Castille, several courts and commentators have posited that *Lilly* simply does not apply to non-custodial confessions or to confessions that do not spread blame to accomplices. *See generally Shea,* 211 F.3d at 669 (stating that *"Lilly's* main concern was with statements in which, as is common in police-station confessions, the declarant admits only what the authorities are already capable of proving against him and seeks to shift the principal blame to another (against whom the prosecutor then offers the statement at trial")); *Robbins,* 197 F.3d at 839–40 (same).[5]

> delivery had been made. He was evidently satisfied, however, that he was dealing with bona fide purchasers, rather than narcotics agents and presumably did not expect that his statements and acts would lead to his arrest. Nevertheless, there was no apparent motive for him to lie about the progress of the transaction, and the petitioner has suggested none. [The declarant] was not in custody, and had no reason to involve another in order to curry favor.
>
> We cannot perceive that a reasonable man in the same circumstances would have made these statements unless he believed them to be true. They were made spontaneously as natural steps in the progress of the transaction into which he had voluntarily entered and in which he could expect retaliation if his predictions did not materialize.
>
> *Parris,* 654 P.2d at 83; *cf.* 29A AM.JUR.2D EVIDENCE § 789 (1994) (observing that "when a declarant unknowingly speaks to informants or undercover agents, the statement is usually admissible under the exception").

5. In assessing relevant factors, it is useful to emphasize that they are to be considered in their totality, as differing interpretations may be ascribed to many discrete factors depending upon context. For example, both the making of a statement to one in a position of authority and to a confidant have been said to enhance reliability. Indeed, one court cautioned against undue emphasis upon such distinctions as follows:

> This court does note ... that it has serious misgivings with respect to the distinction between inculpatory hearsay statements made to acquaintances and those made to law enforcement officers. Often there are incentives to misrepresent the truth in conversation with acquaintances, family and friends that are as powerful as the incentives to misrepresent the truth in conversations with authorities. Likewise, there are powerful incentives to tell the truth to authorities that do not necessarily operate in conversations with relatives and friends. Accordingly, there appear to be strong reasons to require that defendants be protected from the introduction of inculpatory hearsay

There remain, however, two additional factors to which I ascribe substantial weight. First, the government was heavily involved in the production of the most damaging of Auman's statements, the taped hotel conversation, which was specifically procured for use against Auman and any confederates in criminal prosecution. *See* Opinion Announcing the Judgment of the Court, *op.* at 517 & note 3. The United States Supreme Court has expressed concern regarding the nature and extent of governmental involvement in the production of hearsay statements in its Confrontation Clause analysis. *See, e.g., Lilly v. Virginia,* 527 U.S. 116, 139, 119 S.Ct. 1887, 1901, 144 L.Ed.2d 117 (1999) (plurality).[6] While this factor alone would not sway my analysis, the second critical factor is the absence from the record of any demonstration of the factual basis for the government's claim that Auman was unavailable to testify at trial. Such omission persists in the face of an express unavailability requirement attached to the against-penal-interest exception pursuant to which Auman's statements were admitted, *see* Pa.R.E. 804(b)(3), and a clear constitutional preference for face-to-face confrontation. *See Ohio v. Roberts,* 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980); *see also Barber v. Page,* 390 U.S. 719, 724–26, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968) (holding that the government must show the unavailability of a witness before it may introduce less reliable accounts of the witness's statements at trial).

Indeed, the record strongly suggests that Auman was physically available—he testified at a pre-trial hearing two days before the commencement of trial and would appear to have been in the custody of the Commonwealth during trial, since he had pled guilty, was sentenced, and apparently was bound

statements made during the confessions of co-defendants, regardless of the identity of the person to whom the co-defendant confesses. *Phillips,* 64 F.Supp.2d at 681; *accord United States v. Gibson,* 84 F.Supp.2d 784, 789 (S.D.W.Va.2000) (concluding that statement did not bear particularized guarantees of trustworthiness merely because it was made to a relative rather than a law enforcement official).

**6.** The *Lilly* lead's specific comments were directed to early *ex parte* affidavit practice involving, most frequently, an accusatory document procured overtly by the prosecution. *See id.*

over to prison authorities. While the Commonwealth asserts in its brief that Auman had at some point expressed an intention to assert a Fifth Amendment privilege against self-incrimination, thereby rendering him unavailable in a legal sense, such statement does not appear in the record submitted to this Court. *See generally United States v. Pelton,* 578 F.2d 701, 709–10 (8th Cir.1978) (explaining that a party seeking to establish the unavailability of a witness on the ground of a Fifth Amendment privilege cannot merely rely upon a representation that the declarant would claim a privilege if called). Further, the Commonwealth fails to indicate whether such assertion by Auman occurred after his sentencing, after which point his Fifth Amendment privilege related to the burglary and associated conspiracy may have been of lesser concern to Auman and, at least arguably, may no longer have been available to him. *See United States v. Frierson,* 945 F.2d 650, 662 n. 7 (3d Cir.1991) (stating that "[t]he traditional rule is that a convicted defendant has no Fifth Amendment privilege with respect to the acts constituting the offense of conviction"); *cf. United States v. Mitchell,* 122 F.3d 185, 191 (3d Cir.1997) ("an unsentenced defendant who has pled guilty retains a legitimate protectable Fifth Amendment interest as to matters that could affect his sentence").[7]

As the lead opinion notes, the limited flexibility afforded under United States Supreme Court Confrontation Clause precepts is expressly predicated upon a rule of necessity. *See Roberts,* 448 U.S. at 65, 100 S.Ct. at 2538. It is therefore critical, at least in a case where there is heavy government involvement in the procurement of a hearsay statement, that the appellate courts be provided with the basis from which the pertinent need can be assessed. *Cf. State v. Ryan,* 103

---

7. It may be that the Commonwealth's assertion of unavailability was predicated on the pendency of the period allowed for appeal of Auman's sentence. If this was the case, however, it was incumbent on the Commonwealth to disclose this position to the trial court so that the court could implement such trial management procedures as the interests of justice might require. *See Roberts,* 448 U.S. at 74, 100 S.Ct. at 2543 (observing that unavailability in the constitutional sense will require the prosecutor to make a good faith effort to obtain the witness's presence at trial).

Wash.2d 165, 691 P.2d 197, 203 (1984) (holding that "[s]tipu-lated incompetency based on an erroneous understanding of statutory incompetency is too uncertain a basis to find unavail-ability"). I recognize that Appellant, like the Commonwealth, made assertions of Auman's unavailability to the trial court. Nevertheless, on this record, I am simply unable to determine whether the Commonwealth acted on a good faith belief that Auman was unavailable or according to a preference for the introduction of his hearsay statements over his personal ap-pearance before the jury at Appellant's trial.

Thus, I would hold, with regard to third-party hearsay statements of the accomplice of an accused procured through heavy government involvement which are central aspects of the prosecution, that admission into evidence as a statement against interest is not permitted over Confrontation Clause objection where it appears that the witness is under govern-ment control at the time of trial, and the record does not demonstrate the basis for the witness's unavailability and the government's good faith efforts to make the witness available.[8]

8. I recognize that unavailability does not function as a threshold re-quirement of the category of reliable hearsay defined by "particularized guarantees of trustworthiness." Nevertheless, the core values underly-ing Sixth Amendment jurisprudence firmly establish that it is not an irrelevancy. As indicated by the lead opinion, the primary interest protected by the Confrontation Clause is the right of cross-examination, which, the lead also notes, Professor Wigmore described as "the great-est legal engine ever invented for the discovery of the truth." 5 Wigmore, Evidence § 1367, at 32. 5 WIGMORE, EVIDENCE § 1367, at 32 (Chadbourne Rev.1974); accord 4 WEINSTEIN'S EVIDENCE ¶ 804(b)(1)[02], at 804–57 (1981)(noting that "[t]he prime guaranty of reliability in the case of prior testimony or depositions resides in their having been subjected to cross-examination prior to the present trial"). Confronta-tion Clause analysis, therefore, starts with the proposition that in-court testimony from a witness who is subject to cross-examination evinces the degree of reliability against which untested statements should, as a general rule, be measured. Unavailability, which, by definition, elimi-nates the opportunity for cross-examination before the factfinder, is thus an indicator of a lesser degree of reliability, which must then, as a general rule, be counterbalanced by some other trustworthiness indica-tor or indicators to pass Sixth Amendment scrutiny (as noted below, an exception to this general rule persists for hearsay statements admissible pursuant to the coconspirator exception). By its nature, therefore, unavailability is an integral component of any examination for particu-larized guarantees of trustworthiness. I place particular emphasis on it

In light of the above, it was my inclination to remand to the Superior Court for consideration of the Commonwealth's alternative theory of admission for the taped hotel conversations, namely, the coconspirator exception which, notably, does not require a determination of unavailability as a prerequisite, *see* Pa. R.E. 803(25), and has, at least in federal jurisprudence, been described as firmly-rooted for purposes of the Confrontation Clause. *See Bourjaily v. United States,* 483 U.S. 171, 183, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987).[9] I would also have permitted the Superior Court to consider whether Appellant's concession to unavailability despite knowledge of Auman's conviction, sentencing, and physical location, should be deemed an effective waiver of his Confrontation Clause challenge.[10] In this regard, I note that extrajudicial statements may be admissible if the declarant is absent by the connivance, collusion, or consent of the other party. *See generally Mattox v. United States,* 156 U.S. 237, 242, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895).[11] Given, however, that the Commonwealth has admonished the Court, in supplemental briefing, that it has no interest in further consideration of any theory other than that Auman's statements were properly admitted over Appellant's Confrontation Clause objection as declarations against penal

here due to the importance of Auman's statements to the prosecution, the Commonwealth's involvement in the production of those statements, its physical control of the witness at the time of trial, and the absence of a record concerning the basis for the witness's unavailability and the Commonwealth's good faith in this regard. In the circumstances, and on the record presented, I am unable to attach the characterization of "particularized guarantees of trustworthiness" to Auman's statements.

9. Although the bulk of Auman's conversations with Downey while incarcerated could not reasonably be viewed as coconspirator statements, little was revealed there that was not heard by the jury in Auman's own words through the recorded hotel conversation.

10. I find such review appropriate, pursuant to the long-standing principle that an appellate court may sustain a valid verdict for any reason appearing as of record.

11. Here, given the collateral statements within Auman's confessions, just as there is a possibility that the Commonwealth acted out of a preference against live testimony, there is the possibility that Appellant may have maintained a similar motivation. I would also have authorized the Superior Court to remand to the trial court for any fact-finding proceedings that might have been necessary to its resolution.

interest, I join the lead Justices in awarding Appellant a new trial.

Justice CASTILLE, dissenting.

The Court today holds that the directly and exclusively **self-inculpatory** statements made by appellant's unavailable co-conspirator, Barry Auman, which did not shift the blame to appellant (indeed, on their face, the statements did not implicate appellant **at all**) were so unreliable that they must be deemed inadmissible as declarations against Auman's penal interest. I respectfully dissent.

Query if the Court would hold that these confessions were unreliable if it was **appellant** who sought to introduce them? If the roles were reversed and appellant was alleged to have played Auman's role in this conspiracy, and appellant sought to introduce Auman's confession as proof that the Commonwealth had the wrong man, would the Court hold that Auman's confessions were unreliable, and unreliable for reasons having to do with the speculation that comprises the lead opinion's analysis? I think not. I recognize that Confrontation Clause concerns are implicated in this case, which would not be implicated in the above hypothetical; nevertheless, a reasoned analysis of the **reliability** of a declaration against penal interest should not vary depending upon which party in a criminal case offers it up. I would find that Auman's non-custodial, self-inculpatory statements, which on their face implicated Auman alone in the conspiracy, contained sufficient guarantees of trustworthiness to warrant their admission at trial.

As the lead opinion notes, under governing law from the United States Supreme Court, Auman's statements would be deemed admissible under the Confrontation Clause if either of two circumstances existed: (1) the statements were admitted pursuant to a firmly rooted exception to the hearsay prohibition; or (2) the statements were made in circumstances manifesting particularized guarantees of trustworthiness. The lead opinion concludes that Pennsylvania's declaration against penal interest hearsay exception is not firmly rooted and that the

circumstances did not reveal sufficient guarantees of trustworthiness because, in the lead opinion's colorful and imaginative analysis, Auman's inculpations must be deemed, as a matter of law, to be unreliable "braggadocio," *i.e.*, confessionary lies designed only to impress his cellmate. Op. at 527.

For purposes of this dissent only, I shall accept the lead opinion's conclusion that Pennsylvania's declaration against penal interest exception to the hearsay rule, employed in an instance such as this one, is not yet firmly rooted. I hasten to note that, despite my assumption, I believe a strong possibility exists that the United States Supreme Court **will** recognize that some wholly self-inculpatory, non-custodial statements of an unavailable accomplice, such as the ones at issue here, fall within a firmly rooted hearsay exception for purposes of the Sixth Amendment. Support for this prospect may be found in two of the separate opinions filed in *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). *Lilly*, of course, involved the more common situation, not present here, of an accomplice statement which directly inculpated **both** the non-testifying accomplice and the defendant on trial, where the government sought, in essence, to bootstrap from the reliability deemed inherent in that part of the declaration which was contrary to the speaker's penal interest. In other words, the government argued that, since the portions of the statement that inculpated the speaker/accomplice were presumptively reliable, the portions that spread the blame to a co-defendant should be deemed reliable, too.

The Supreme Court rejected that argument, albeit no clear majority rationale emerged. The plurality opinion by Justice Stevens, which was joined by Justices Souter, Ginsburg and Breyer on this point, noted the general rule that confessions of non-testifying accomplices which implicate both the accomplice and the accused are ordinarily deemed untrustworthy because they are not unambiguously adverse to the declarant's penal interest. This is so because it is inherently suspect when a person attempts to shift blame for a crime to another, while downplaying his own involvement. 527 U.S. at 131–32, 119 S.Ct. 1887 (noting that holding in *Douglas v. Alabama*, 380

U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), to effect that confession of nontestifying accomplice which shifts responsibility to defendant is inadmissible under Confrontation Clause, was " 'premised on the basic understanding that when one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is suspect and must be subjected to the scrutiny of cross-examination.' "), quoting *Lee v. Illinois,* 476 U.S. 530, 541, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986).

The *Lilly* plurality acknowledged, however, that the opinion in *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (plurality) provided at least arguable support for an exception to this general rule. In *Dutton,* Justice Stevens noted, the Court had held that "the admission of an accomplice's spontaneous comment that indirectly inculpated the defendant did not violate the Confrontation Clause" because "the co-conspirator spontaneously made the statement and 'had no apparent reason to lie.' " *Lilly,* 527 U.S. at 132 n. 2, 119 S.Ct. 1887, quoting *Dutton,* 400 U.S. at 86–89, 91 S.Ct. 210. Chief Justice Rehnquist's concurring opinion in *Lilly,* which was joined by Justices O'Connor and Kennedy, also cited to the Court's plurality opinion in *Dutton* and addressed the possibility that self-inculpatory, non-custodial accomplice admissions may be deemed sufficient to constitute a firmly rooted hearsay exception, even if they also inculpate a co-defendant:

The Court in *Dutton* held that the admission of an accomplice's statement to a fellow inmate did not violate the Confrontation Clause under the facts of that case, and I see no reason to foreclose the possibility that such statements, even those that inculpate a codefendant, may fall under a firmly rooted hearsay exception. The Court in *Dutton* recognized that statements to fellow prisoners, like confessions to family members or friends, bear sufficient indicia of reliability to be placed before a jury without confrontation of the declarant. Several courts have similarly concluded that such statements fall under a firmly rooted hearsay exception.

*Lilly*, 527 U.S. at 147, 119 S.Ct. 1887 (Rehnquist, C.J., concurring) (citations omitted). In light of these expressions, it is apparent that the United States Supreme Court still may find, in an appropriate case, that declarations against penal interest may be deemed to fall under a firmly rooted exception to the hearsay rule. A case such as this one presents a far stronger argument in favor of firm rooting than did the statements at issue in either *Dutton* or *Lilly*. This is so because the inherently suspect circumstance of blame-shifting is not present; rather, the accomplice statements here merely proved the speaker's own role in the conspiracy. Furthermore, the very fluidity that has characterized the law of evidence cautions against assuming that all declarations against penal interest will fail the firm rooting test. Unless we are doomed to have evidentiary principles deemed cryogenically frozen in time, the more familiar and frequent such uses of self-inculpatory statements become under the second alternative, the more "firm" the rooting of the exception must necessarily become. In short, I expect that the line between the newly planted and the firmly rooted, where these statements are at issue, will blur as the judicial seasons pass.

Turning to the alternative ground under which the unavailable Auman's statements may be deemed admissible—*i.e.*, the "residual 'trustworthiness' test" recognized in *Lilly* and *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)—the question, in my view, is not even close. The first point to be made in assessing trustworthiness, of course, is that the confessions here were totally unlike the statements whose admission led to the reversal in *Lilly*. In *Lilly*, the non-testifying accomplice's statements, which were admitted under the theory that they were declarations against his penal interest, directly shifted blame for the murder to the defendant. Auman's statements here, in contrast, did not directly implicate appellant in the crimes **in any way**. In this case charging conspiracy, not murder, the statements were proffered only and precisely to the extent that they proved Auman's guilt; they proved the *corpus delicti* of the conspira-

cy charge.[1] The statements "incriminated" appellant only indirectly, *i.e.*, through linkage with other, independent evidence establishing appellant's connection to the conspiracy Auman had admitted to. Since there was no blame-shifting at work in Auman's statements, and no attempt to bootstrap statements which incriminated appellant onto the statements which incriminated Auman, the concerns that powered the decision in *Lilly* are simply not at all present here.

Other objective circumstances surrounding Auman's confessions corroborate their trustworthiness. The statements were not ambiguous or subtle; rather, they directly and unequivocally implicated Auman in criminal conduct. That conduct, moreover, did not involve some completed, historical criminal conquest; rather, it involved a burglary in which Auman was still trying to peddle some of the stolen goods. The statements also did not involve custodial confessions to police, such that Auman might be seen as seeking to curry favor with those in a position to prosecute him for the (ongoing) crime; indeed, they were not made in circumstances where Auman "stood to gain" by his self-incrimination at all. *Lilly*, 527 U.S. at 132, 119 S.Ct. 1887, *quoting Lee*, 476 U.S. at 541, 106 S.Ct. 2056. By the same token, the statements were not made in response to coercive police tactics, much less tactics that involved suggesting the incriminating facts to Auman. Police, in other words, did not feed Auman the facts that incriminated him and secure his assent to that scenario; Auman volunteered them, in a fashion that was internally consistent and which suggested a familiarity with the crime that necessarily bespoke reliability. Nor were the statements made in circumstances where Auman was attempting to minimize his culpabil-

---

1. Although appellant was not tried jointly with Auman, since the charge was conspiracy, the Commonwealth's proof that Auman was guilty of the conspiracy obviously was relevant; and employing Auman's confessions were a legitimate way to prove that guilt, assuming that the confessions were otherwise admissible. *See generally Williamson v. United States*, 512 U.S. 594, 603, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) (noting that "a declarant's squarely self-inculpatory confession . . . will likely be admissible under Rule 804(b)(3) against accomplices of his who are being tried under a co-conspirator liability theory" (citation omitted)).

ity, another circumstance that the *Lilly* plurality suggested might suggest that an inculpation is unreliable. 527 U.S. at 132, 119 S.Ct. 1887, *citing Lee,* 476 U.S. at 552–53, 106 S.Ct. 2056 (Blackmun, J., dissenting). Instead, the statements were made in the presence of persons whom Auman had little reason to suspect were other than willing conspirators in his own ongoing efforts to sell the valuable stamps he had stolen in the burglary.

The time that lapsed between Auman's statements is also significant. Auman did not merely admit responsibility for a crime in front of another inmate while in jail; rather, he put his money where his mouth was. Once Auman and his cellmate, Joseph Downey, were released from prison, they undertook to sell the stamps. This follow-up conduct tended to corroborate Auman's earlier admissions. For good measure, when Auman made additional inculpatory statements in front of an undercover detective while pursuing the sale of the goods, he specifically indicated his awareness and concern with the fact that he was incriminating himself. Auman's consciousness of the import of what he was disclosing suggests the trustworthiness of the admissions. In my view, taken as a whole, these circumstances overwhelmingly demonstrated the reliability of the statements, making them admissible under the second part of the *Lilly/Roberts* test.

The lead opinion largely dismisses such objective factors, which are based on actual trial evidence, preferring rank speculation instead. The primary factor in the lead opinion's conclusion that Auman's confessions were unreliable as a matter of law is that the admissions began with a confession made to his cellmate, Joseph Downey. The lead opinion apparently would hold that such confessions are inherently unreliable. The lead opinion postulates that Auman "may have" admitted to the crime to Downey not because he actually committed the crime, but because he was trying to "enhance his standing in the eyes of his cellmate" and thought falsely taking credit for an unsolved, allegedly "notorious" crime would do that. The lead opinion follows this bald assumption about the universal motivations of those peopling

our prisons not with a citation to legal authority, but with the tautological declaration that, "[c]onversations between cellmates do not carry any special indicia of reliability." The rest of the lead opinion's analysis is infected by its universal predicate assumption. As the analysis progresses, it is no longer a mere "possibility" that Auman was a lying braggart seeking to impress his cellmate, but a given fact. Op. at 527 ("Given that the inculpatory statements [in the hotel room] followed upon the **likely** braggadocio of the jail cell conversations") (emphasis supplied). According to the lead opinion, once out of jail, Auman "had to continue the picture of the notorious burglar ... he had painted of himself in the jail cell." *Id.* The crime has now been transformed into Auman's "exploits." *Id.*

The lead opinion's imaginative "scripting" might be persuasive if it had a scintilla of factual support. It also might be persuasive if the question arose in the literary realm. But the lead opinion's assumption of this particular universally imputed motive for cellmate confessions is not at all persuasive in the legal realm. Such speculation about why inmates may falsely confess to open crimes, at best, may be fodder for argument as to the weight a jury should accord a declaration against penal interest once admitted. But I fail to see how that utter speculation should be deemed to destroy, as a matter of law, the reliability of an otherwise-reliable declaration against penal interest. Certainly, criminal defendants hoping to employ such jailhouse confessions to assist their own cause will be disappointed to learn of today's "braggadocio" reasoning.

The lead opinion's behavioral assumption turns on its head the very experience-based assumption about human behavior which led to the recognition of declarations against penal interest in the first place, *i.e.*, the assumption that people generally are unlikely to confess to crimes they did not commit. *See, e.g., Lilly,* 527 U.S. at 126–27, 119 S.Ct. 1887 ("against penal interest" exception to hearsay rule "is founded on the broad assumption 'that a person is unlikely to fabricate a statement against his own interest at the time it was

made.' "), *quoting Chambers v. Mississippi,* 410 U.S. 284, 299, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). I do not for a moment dispute that cellmate conversations are not uniquely reliable, but neither are they uniquely unreliable. However, the point is that it requires an Olympian leap in logic, a leap contradicted by experience, to conclude, as the lead opinion would, that conversations with strangers in jail which include **confessions to unsolved crimes** must be deemed, as a matter of law, to be lies motivated by "braggadocio." If human nature is to be accorded any role at all in our analysis, we must continue to recognize that it is highly unusual to falsely confess to an unsolved crime. It is more unusual to falsely confess that crime to a stranger, since that circumstance is fraught with unknown peril.[2] It is even more unusual still to falsely confess the open crime to a cellmate, because the peril is even greater, given the obvious potential interest the cellmate has in arranging his own "deal" by gathering evidence against others.

I do not think the lead opinion's assumption concerning the universal secret motivations of cellmate confessors is the sort of objective circumstance surrounding the statement which is contemplated by cases like *Lilly, Roberts,* and *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). People lie to friends, to spouses, to co-workers, to priests, to the IRS. People lie under oath. People occasionally even lie in excited utterances, or when seeking medical treatment, or when making dying declarations; and yet, those statements are routinely admitted based upon the assumption, rooted in our human experience, that such statements **generally** are reliable. If the mere prospect that a lie was at work were deemed sufficient to make an out-of-court statement unreliable, there would be very few hearsay exceptions. In this regard, the lead opinion's assumption is less an attack on these particular confessions than it is an attack on all out-of-court statements. The fact that it is theoretically **possible** that Auman was lying when he confessed—just as it is always

**2.** The lead opinion acknowledges this factor, which would seem to be self-evident, yet inexplicably draws the opposite conclusion from it. Op. at 526.

possible that a hearsay statement covered by a firmly rooted exception is a lie in a particular case—cannot control the inquiry. The subjective assumptions of the lead opinion, though they make for entertaining reading, do not negate the overwhelming, contrary objective circumstances the majority ignores, circumstances which prove the reliability of Auman's confessions.

Mr. Justice Saylor's Concurring Opinion finds Auman's statements to be unreliable for a different reason than that posed by the lead opinion. The concurrence assigns controlling weight to the absence of an affirmative record indicative of "the basis for [Auman's] unavailability and the government's good faith efforts to make the witness available." Concurring op. at 531.[3] As the lead opinion notes, however, the parties essentially stipulated to Auman's unavailability, and appellant has raised no challenge to Auman's unavailability on this appeal. Plurality op. at 518 n. 5.

I deem the absence of any complaint from appellant as to Auman's unavailability or to the Commonwealth's lack of a "good faith belief" that he was unavailable to be supremely significant and, in this case, most likely strategic on the part of the defense. As the concurrence notes, Pennsylvania's version of the declaration against penal interest exception has traditionally been deemed applicable in this Commonwealth only where, among other requirements, the witness is unavailable. See, e.g., Pa.R.E. 804(b)(3). Thus, even apart from appellant's constitutional claim, appellant always had available to him a narrower and clearer state evidentiary objection if he believed Auman was actually available. But such an objection had obvious tactical perils, at least under the unique facts of this case. Auman's statements, as redacted, were offered for an extremely narrow purpose; i.e., to prove Auman's own guilt in the conspiracy. As redacted, Auman's statements did not implicate appellant; instead, they "incriminated" appellant

3. The concurrence also echoes and expands upon the lead opinion's concern with alleged "heavy government involvement" in the production of Auman's statements. On this point, I am in agreement with Mr. Justice Eakin's Dissenting Opinion, which I join.

only because of independent evidence which linked him to the conspiracy that Auman had confessed to.

Actual production of Auman against appellant as a trial witness—which is what appellant risked if he had pressed the claim, now raised by the concurrence, that Auman was not truly unavailable—held the potential for much greater harm. In that circumstance, Auman, if produced, would have been in a position to **directly** implicate appellant with first-hand testimony as to appellant's role in the conspiracy. To be sure, Auman, if produced, would have been subject to possibly effective cross-examination and impeachment on numerous grounds. But, on balance, it is not unreasonable to see why appellant might have determined that it was a better course to keep Auman off the stand entirely and, thus, made a strategic decision not to press a state law evidentiary objection based upon an argument that Auman was no longer unavailable. Such a course minimized the damage that Auman could do to appellant, while still preserving a neatly-framed constitutional objection to the very limited evidence that was produced.

In point of fact, however, there is no reason to speculate whether Auman was "truly" unavailable; the parties never disputed the point.[4] For our review purposes, it does not matter whether this is what in fact occurred. What matters is that an obvious objection based upon new-found "availability," or lack of a good faith basis for the Commonwealth to claim unavailability, existed but was not raised below and is not pressed on appeal. There is nothing in our jurisprudence that requires the Commonwealth to prove a good faith basis for an assertion of unavailability where, as here, appellant made an identical representation of unavailability, and never called into question the good faith of the Commonwealth.

In this regard, I note the coincidental fact that, in *Lilly,* the petitioner claimed in his merits brief that the "unavailable" witness whose out-of-court statement was produced against

4. It should be noted that the fact that Auman had pleaded guilty and had been sentenced by the time of appellant's trial does not mean that he was willing to testify, even in the absence of a Fifth Amendment privilege.

him at trial "was not truly 'unavailable' because the Commonwealth could have tried and sentenced him before petitioner's trial, thereby extinguishing [the witness's] Fifth Amendment privilege." *Id.* at 124 n. 1, 119 S.Ct. 1887. The Supreme Court rejected that belated argument, noting that it would assume, consistently with the manner in which the question had been posed in the petitioner's certiorari request, that the witness was unavailable. *Id.* In the discretionary appeal *sub judice,* although I understand why the concurrence is suspicious of whether Auman truly was unavailable by the time of trial, the parties have unfailingly agreed, in the courts below and here, that he was. Indeed, unlike in *Lilly,* appellant makes no belated suggestion that Auman was available. I would accept this particular point as the parties present it to us; accordingly, I entirely agree with the lead opinion that "[t]he question of availability is therefore not before this Court." Op. at 518 n. 5.

In my view, the trial judge committed no error in admitting the relevant, reliable confessions of this unavailable witness. I respectfully dissent.

NEWMAN joins this dissenting opinion.

Justice EAKIN, dissenting.

I must disagree with the conclusion of my colleagues, as I find the statement at issue to be corroborated by the circumstances and sufficiently reliable; finding the trial court abused its discretion by admitting it is inappropriate, in my judgment.

The Commonwealth's reasoning arguing corroboration is logical; I find appellant's less so. For example, the year's time for "reflection" simply means the crime was stale or forgotten in the minds of anyone unconnected to it-only the perpetrators would still be thinking of such a burglary after that much time. Who is going to impress other prisoners with a year old offense, whether it was publicized at the time or not? The size of the take was worth bragging about, but who knew that but the perpetrators? Were one to pick a boastworthy crime to falsely associate with, one would not be likely

to pick this one; logically, the decision to brag about this crime suggests actual involvement, not deceitfulness.

The involvement of the police in recording the hotel conversation is a red herring. Unless Auman knew about that involvement, or was somehow coerced during the conversation, this has absolutely nothing to do with reliability or admissibility. Mantra-like finger pointing does little to show why police involvement affected the statement or its reliability. Governmental involvement may make one look at the circumstances with a watchful eye, but unless that eye sees something, police involvement in and of itself is no reason to label anything unreliable. Indeed, the recording limits the prospects of inaccurate recollections that come when authorities are not involved.

The final suggestion, Auman's purported narcotic use, was found to be a factual non-starter, and we cannot reconsider findings of fact. Consequently, finding no reason to question the reliability of Auman's statements, I would affirm the sentence.

NEWMAN joins this dissenting opinion.